UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RITA R JOHNSON,

                Plaintiffs,                            Case No. 17-cv-12405

v                                        Honorable Thomas L. Ludington

TIMOTHY MORALES, et al,

                Defendants.

_____/

**OPINION AND ORDER GRANTING MOTION FOR LEAVE TO FILE
SUPPLEMENTAL AUTHORITY, DENYING MOTION FOR RECONSIDERATION,
GRANTING MOTION TO DISMISS, DENYING MOTION FOR LEAVE TO FILE THE
PROPOSED SECOND AMENDED COMPLAINT, AND DISMISSING AMENDED
COMPLAINT**

On July 25, 2017, Plaintiff Rita R. Johnson filed a complaint alleging that Defendants Timothy Morales, Dennis Jordan, and the City of Saginaw violated her due process rights when they suspended her business license. Compl., ECF No. 1. On August 23, 2017, Johnson filed an amended complaint which provides additional factual allegations and contains an additional count alleging that Defendants violated her Fourth Amendment due process rights. ECF No. 5. On September 9, 2017, Johnson filed a motion for a temporary restraining order and, alternatively, a motion for a preliminary injunction. ECF No. 7. That motion was focused solely on Count Four of the Amended Complaint, which alleged that Johnson's due process rights would be violated if Defendant Morales, who issued the initial order suspending Johnson's business license, sat on a panel reviewing that decision.

The Court denied that motion. ECF No. 8. On September 21, 2017, Johnson filed a motion for reconsideration. ECF No. 10. On the same day, Defendants filed a motion to dismiss the suit. ECF No. 11. Four days later, Johnson filed a motion for leave to submit supplemental authority in

support of her motion for reconsideration. ECF No. 12. And, on October 17, 2017, Johnson filed a motion for leave to file a second amended complaint. ECF No. 15.

For the reasons that follow, Johnson's motion for leave to submit supplemental authority will be granted, but her motion for reconsideration will be denied. Defendants' motion to dismiss will be granted and, because amendment would be futile, Johnson's motion for leave to file a second amended complaint will be denied.

## I.

### A.

The well-pleaded factual allegations in Johnson's complaint, as articulated in the September 15, 2017, opinion and order, will be summarized here. Johnson owns and operates Rita's Southern Soul Café in Saginaw, Michigan. Am. Compl. at 1. Defendant Timothy Morales is the Saginaw City Manager. Defendant Dennis Jordan is the City of Saginaw's Human Resource Director.

On May 6, 2017, Johnson rented the cafe to a private party. *Id.* at 2. In the early morning hours of May 6, 2017, unknown individuals "emerged from a vehicle . . . and began shooting at Plaintiff's building." *Id.* To her knowledge, Johnson's guests did not commit any crime during the assault and Johnson herself has no connection to any of the shooters.

The Saginaw Police Department responded to the shooting. Police Chief Robert Ruth later opined that the incident was likely gang-related. *Id.* at 3. Johnson faults the City of Saginaw for not ordering "the criminal shooters to halt their illegal activities." *Id.* at 4. Instead, in reaction to the shooting, the City of Saginaw took action against Johnson:

> Rather than focus efforts on apprehending and stopping the unknown gang-members who *actually* acted illegally and unlawfully, Defendant CITY OF SAGINAW, likely in an attempt to shift blame from its poorly-staffed and ineffective police department, took adverse action against Plaintiff by suspending

her business license for actions for which she is not responsible and for alleged crimes she did not otherwise commit or authorize

*Id.* (emphasis in original).

The City of Saginaw also turned off Johnson's water supply "without notice or authority in a backhanded way to shut down Plaintiff's commercial operations." *Id.*

The administrative appeal process for challenges to the suspension of business licenses is governed by the City of Saginaw Code of Ordinances, 110.06(E). Pursuant to 110.06(F), if "the City Manager or their designee" determines that an immediate suspension of a business license is necessary to protect "the public health, morals, safety, or welfare," they may unilaterally order an immediate suspension. But the City Manager or their designee must hold a hearing within five days to allow the license holder to challenge the suspension. *Id.* On May 8, 2017, Timothy Morales "issued a governmental order entitled *Notice of Immediate Suspension of Business Activity* whereby he, as an agent of Defendant CITY OF SAGINAW, ordered the halt of <u>all</u> (and not just illegal) activities, including all commercial activities of any type." Am. Compl. at 4. (emphasis in original). Johnson alleges that the shutdown order was intended to destroy Johnson's commercial interests.

In the notice of suspension, City Manager Morales identified five reasons for the immediate suspension. *See* Not. Susp., ECF No. 5, Ex. A. First, Morales cited the "serious and violent criminal activity generated by the operation of this establishment." *Id.* at 1. Second, he specified that the criminal activity had "resulted in significant injury to persons and damage to property." *Id.* Third, the "serious and violent criminal activity" had "occurred as recently as Saturday, May 6, 2017." *Id.* Fourth, Morales concluded that the criminal activity constituted "a hazardous condition contrary to the health, morals, safety, and welfare of the public." *Id.* And finally, Morales faulted the café for failing to "maintain adequate security to prevent or discourage unlawful behavior." *Id.*

Pursuant to the governing city ordinance, a hearing on the suspension was scheduled for May 11, 2017. Dennis Jordan, the Human Resources Director for the City of Saginaw, was designated as the hearing officer. According to Johnson, Timothy Morales is the immediate supervisor of Defendant Jordan. The hearing was held as scheduled, but Johnson alleges that Jordan "allowed hearsay testimony, dubious evidence, and irrelevant testimony." *Id.* at 4. Johnson highlights two examples of alleged misconduct during the hearing. First, Johnson asserts that the City of Saginaw was represented at the hearing by a law firm which had previously represented Jordan. *Id.* Despite this connection, Jordan did not recuse himself from the hearing. Second, Jordan permitted Police Chief Ruth to testify about the events of May 6, 2017, even though he had not been present at the scene or directly involved in the ensuing investigation.

Two months after the hearing, Jordan denied the appeal. *Id.* at 6. While Jordan was considering the appeal, Johnson's counsel asked "how the City could have a Human Resources Director serve as a neutral, detached decision maker and how it could allow hearsay and conjecture as evidence in such a hearing." *Id.* at 5. In response, counsel for the City suggested that, because it was only an administrative hearing, that level of due process was not required. *Id.* Johnson's counsel then submitted a number of Freedom of Information Act Requests seeking information regarding the City's processes and procedures. *Id.*

On July 11, 2017, "City Attorney Amy Lusk introduced a proposal to the City of Saginaw City Council to amend the City Ordinance permitting the appointment of employees of the City of Saginaw as the hearing officer to conduct hearings like the one undertaken against Plaintiff." *Id.* The update to the City Ordinance has been approved.

In the first amended complaint, Johnson frames four Counts which all allege that her Fourth Amendment due process rights were violated. In Count I, Johnson contends that Dennis Jordan

was not a neutral and detached arbiter because he was reviewing his supervisor's actions. In Count II, Johnson argues that her "constitutionally protected right of property" was violated when the City of Saginaw suspended her business license without providing a pre-suspension hearing. In Count III, Johnson argues that the City Ordinance, which requires a public hearing after license suspension, is unconstitutional because it places the burden of demonstrating why the license should not be suspended on Johnson. In Count IV, Johnson argues that her due process rights will be violated if Timothy Morales is permitted to sit on the three-person panel which will review Jordan's decision.

**B.**

The proposed second amended complaint which Johnson submitted on October 17, 2017, largely mirrors the allegations contained in the first amended complaint. Prop. Sec. Am. Compl., ECF No. 15, Ex. 1. The differences will be briefly highlighted.

In the proposed second amended complaint, Johnson emphasizes that the actions of the shooters on May 6, 2017, had nothing to do with Johnson's business and that Johnson was in full compliance with all local laws on that day. *Id.* at 3. She also alleges that, to date, the City of Saginaw Police Department has not arrested anyone associated with the shooting that took place in May. *Id.* As regards the May 11, 2017, hearing before Defendant Jordan, Johnson adds the additional allegation that "[i]n the days that followed . . . Defendant DENNIS JORDAN had *ex parte* communications with Police Chief Ruth asking about details of his prior testimony via secret, non-public email communications." *Id.* at 5.

Most of the new allegations in the proposed second amended complaint involve Johnson's administrative appeal of Defendant Jordan's decision to uphold the license suspension. After Johnson's motion for an order enjoining the City of Saginaw from permitting Defendant Morales

to participate in the appeal of Defendant Jordan's decision was denied, Johnson requested the appeal hearing. The City of Saginaw scheduled the hearing for October 16, 2017. *Id.* at 6. The following people served on the panel: "Janet Santos, City Clerk; Kim Mason, Director of Water & Waste Water who served at the selection and direction of Defendant TIMOTHY MORALES; and Darrin Jerome, Deputy/Mechanical Inspector, who served at the selection and direction of City Inspector John Stemple." *Id.* Johnson alleges that none of the panel members have any "training, experience, or understanding with the rules of evidence, rules in legal interpretation and its application of evidence, and/or how the disputed ordinance is supposed to be applied." *Id.*

Johnson argues that the appeal panel failed to understand her arguments and, further, "failed to reasonably review into the facts, law, or principles raised by the attorneys in writing or by oral arguments to a sufficient enough level to even legally understand the technical arguments." *Id.* at 7. For that reason, Johnson believes the appeal board "is a sham." *Id.* In fact, Johnson believes that the panel was selected "precisely because they lack sufficient and/or the requisite minimum understanding of the legal obligations imposed by local and the federal constitution." *Id.*

After the attorneys argued before the panel, "a motion was made by Mason to affirm the decision." *Id.* The panel did not engage in "any substantive discussion or debate" prior to the motion being made. *Id.* Prior to voting on the motion, members of the panel "inquired whether any settlement offers had been made between Defendant CITY OF SAGINAW and Plaintiff as part of this federal lawsuit." *Id.* After being informed that no settlement had been reached, the appeal panel "voted to blankly affirm the decision of Defendant Timothy Morales." *Id.* The panel provided no written or oral explanation for their decision. *Id.*

The proposed second amended complaint contains nine claims. Count One alleges that the City of Saginaw Code of Ordinances § 110.06(E), which provides guidelines and procedures for

the review panel, is unconstitutional. Count Two alleges that § 110.06(F), which permits the City Manager to immediately suspend a business license if doing so is "in the interest of the public health, morals, safety, or welfare," is void for vagueness. In Count Three, Johnson alleges that the City of Saginaw has selectively enforced § 110.06(F). Counts Four, Five, and Six frame claims for "Undue Process Violation," essentially arguing that due process was violated because Dennis Jordan is Defendant Morales's direct subordinate, because Defendant Jordan held "secret, ex parte communications with Chief Ruth outside the presence or knowledge of Plaintiff," and because Defendant Jordan's personal attorney appeared at the hearing on behalf of the City of Saginaw. *Id.* at 10–12. In Count Seven, Johnson alleges that her constitutionally protected right to property was violated when her business license was suspended without a hearing and in the absence of exigent circumstances. Count Eight asserts that the City of Saginaw Code of Ordinances § 110.06(D) unconstitutionally places the burden of showing that the suspension should be revoked on Johnson. And Count Nine contends that the City of Saginaw violated Johnson's substantive due process rights when it suspended her business license based on the actions of third parties.

## II.

### A.

Pursuant to Eastern District of Michigan Local Rule 7.1(h), a party can file a motion for reconsideration of a previous order, but must do so within fourteen days. A motion for reconsideration will be granted if the moving party shows: "(1) a palpable defect, (2) the defect misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case." *Michigan Dept. of Treasury v. Michalec*, 181 F. Supp. 2d 731, 733-34 (E.D. Mich. 2002) (quoting E.D. Mich. LR 7.1(g)(3)). A "palpable defect" is "obvious, clear, unmistakable, manifest, or plain." *Id.* at 734 (citing *Marketing Displays, Inc. v. Traffix Devices,*

*Inc.*, 971 F. Supp. 2d 262, 278 (E.D. Mich. 1997). "[T]he Court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the Court, either expressly or by reasonable implication." E.D. Mich. L.R. 7.1(h)(3). *See also* Bowens v. Terris, No. 2:15-CV-10203, 2015 WL 3441531, at *1 (E.D. Mich. May 28, 2015).

**B.**

In her emergency motion for reconsideration, Johnson again requests a Court order enjoining the City of Saginaw from placing Timothy Morales on the appeal panel. ECF No. 10. In her motion for leave to file a second amended complaint, Johnson asserts that the motion for reconsideration is now moot because the appeal hearing has occurred. Nevertheless, the merits of Johnson's motion for reconsideration will be briefly addressed to recount why the Court declined to provide emergency relief.

As an initial matter, Johnson has also filed a motion or leave to submit supplemental authority in further support of her motion for reconsideration. ECF No. 12. That motion will be granted. But because neither that authority nor the arguments advanced in the motion for reconsideration change the Court's conclusion, the motion for reconsideration will be denied.

In the Court's September 15, 2017, opinion and order denying Johnson's motion for preliminary injunctive relief, the Court based its conclusion on one rationale, provided an alternative explanation for why the motion would be denied, and identified a further potential shortcoming of Johnson's motion. First, the Court concluded that "Johnson is extremely unlikely to prevail on the merits of her claim." Sept. 15, 2017, Op. & Order at 9. In so holding, the Court relied in large part upon *Withrow v. Larkin*, where the Supreme Court concluded that it was not violative of due process for an administrative board to suspend a doctor's license even though the same board had also conducted the investigation of the charges. 421 U.S. 35, 46 (1975). The

parallels to the present case are unmistakable. Emphasizing the limited nature of the review of a motion seeking preliminary injunctive relief, the Court concluded that Johnson had not established a strong likelihood of success on the merits.

While the Court also discussed the question of whether Johnson had demonstrated that irreparable injury would occur without relief the denial of the motion for preliminary injunctive relief was predicated primarily on Johnson's inability to establish a strong likelihood of success on the merits. And now, in her motion for reconsideration and motion for leave to submit supplemental authority, Johnson does not challenge the Court's analysis regarding whether she demonstrated a strong likelihood of success on the merits. Rather, she challenges the suggestion that she had not demonstrated that irreparable injury would occur absent preliminary injunctive relief and that she was not appealing from a final decision.[1]

Thus, Johnson is not taking issue with any part of the primary rationale for denying her motion for preliminary injunctive relief. "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). And when the moving party cannot meet its burden of demonstrating a likelihood of success on the merits, preliminary injunctive relief is not warranted. *See also Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir.

---

[1] And Johnson's argument on this second point misapprehends the substance of the analysis. The Court explained, in a footnote, that although exhaustion of state remedies is not a prerequisite to bringing a § 1983 suit, the "administrative action must generally be final before it is judicially reviewable." Sept. 15, 2017, Op. & Order at 11 n.2 (citing *Hammond v. Baldwin*, 866 F.2d 172, 176 (6th Cir. 1989)). The Court declined to premise its decision on a lack of finality, but opined that some of Johnson's claims might be unripe because no final administrative decision had been rendered. Now, Johnson cites to cases which explain that § 1983 plaintiffs need not exhaust state administrative remedies before bringing suit. But, as indicated before, "'[t]he question whether administrative remedies must be exhausted is conceptually distinct ... from the question whether an administrative action must be final before it is judicially reviewable.'" *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989) (quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 192 (1985)).

2002) (explaining that where the movant is unlikely to prevail on the merits of their constitutional claim, a presumption of irreparable injury is not warranted). Thus, even if Johnson prevailed on the arguments raised in her motion to dismiss, the Court's ultimate conclusion would be unchanged.[2] Johnson's motion for reconsideration will be denied.

## III.

Defendants are moving for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not provide "detailed factual allegations" to survive dismissal,

---

[2] In her motion for leave to submit supplemental authority, Johnson argues that when constitutional rights are threatened or impaired, irreparable injury is always presumed. Johnson thus contends that the Court erred when it questioned whether she had shown that irreparable injury would result if no injunction were entered because her "allegations epitomize harm that is fully compensable by monetary damages." Sept. 15, 2017, Op. & Order at 10 (citing *United States v. Michigan*, 230 F.R.D. 492, 495 (E.D. Mich. 2005)).

It is undoubtedly true that, generally, an allegation of a constitutional violation is sufficient to justify a presumption of irreparable injury. And the Sixth Circuit has, in numerous cases, spoken in sweeping terms on that point. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."). That principle appears to be derived from the fundamental axiom that "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Because the damages resulting from constitutional violations are generally intangible, they are not fully compensable by monetary damages.

But some cases (and commentators) have observed that not all constitutional violations inevitably involve damages that are not fully redressable by money damages. *See Tri-Twp. Ambulance Serv. v. Ne. Michigan Med. Control Auth.*, No. 08-14622-BC, 2008 WL 4793344, at *1 (E.D. Mich. Nov. 3, 2008); *Michigan*, 230 F.R.D. at 495; *Conn v. Deskins*, 199 F. Supp. 3d 1172, 1175 (E.D. Ky. 2016); *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001). *See also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006); *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003); Anthony Disarro, *A Farewell to Harms: Presuming Irreparable Injury in Constitutional Litigation*, 35 Harv. J. L. Pub. Pol. 743 (2012), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1909876.

No Sixth Circuit authority has been identified that directly addresses the question of whether mere allegation of constitutional violation is sufficient to require a presumption of irreparable injury where the injury is fully compensable by monetary damages. Nevertheless, to repeat, the motion for preliminary injunctive relief was denied because Johnson did not demonstrate a strong likelihood of success on the merits.

but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

Plaintiff has requested leave to file a second amended complaint. Federal Rule of Civil Procedure 15(a)(2) provides that a party may amend its pleading with the court's leave and that "the court should freely give leave when justice so requires." Denial of a motion to amend is appropriate, however, "'where there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'" *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

An amendment would be futile if the amended complaint does not state a claim upon which relief can be based. A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). The standard of review for Defendants' motion to dismiss and Plaintiff's motion for leave to file a second amended complaint is thus identical.

## IV.

There is substantial overlap between the motion to dismiss and the proposed second amended complaint. Accordingly, Defendant's motion to dismiss the amended complaint will be

considered first. And then Plaintiff's motion for leave to file a second amended complaint will be addressed.

## A.

In the motion to dismiss, Defendants argue that all four claims in Johnson's amended complaint should be dismissed for failure to state a claim. Defendants also argue that the suit should be dismissed because, at the time the amended complaint was filed, the administrative decision she was challenging was not yet final.[3] Defendants' challenges to the claims in the amended complaint will be analyzed in turn.

## 1.

First, Defendants argue that Plaintiff's claims alleging that Defendants Jordan and Morales are not neutral and detached arbiters and thus that review of the suspension by them violates her due process rights fail as a matter of law. In the first count of the amended complaint, Johnson alleges that Dennis Jordan is not "a neutral and detached arbiter," as due process requires, because of his connection with his supervisor, Timothy Morales. Defendants argue that dismissal of the first count is appropriate because the amended complaint does not "allege that Defendant Jordan has a pecuniary interest in the outcome, nor . . . that Plaintiff Johnson has in any way targeted him for personal abuse or criticism." Mot. Dismiss at 4, ECF No. 11.

In response, Johnson admits that there is no evidence that Jordan has a pecuniary interest in the operation of Johnson's business or that Johnson has personally targeted him in any way. Rather, Johnson argues that the "*actual* question in this case is whether a person self-selected by his direct supervisor (the latter who has the power to fire or give poor evaluations of that decision maker as part of its regular City job) would have 'a possible temptation' to forget the burden

---

[3] As reflected in Johnson's proposed second amended complaint, the decision is now final. Accordingly, Defendants' finality argument is moot and will not be addressed.

required of his to reverse or invalidate his supervisor's legal decision to suspend a business?" Pl. Resp. Br. at 11, ECF No. 14 (emphasis in original).

### i.

The "minimum requirements of due process" include the right to a hearing before "a 'neutral and detached' hearing body . . . , members of which need not be judicial officers or lawyers." *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972). And that minimum requirement of due process is applicable both to courts and administrative agencies which are involved in adjudication. *Withrow v. Larkin*, 421 U.S. 35, 46 (1975). Johnson argues that she did not receive a "neutral and detached" arbiter here.

Over the years, courts have identified a number of situations where "experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow*, 421 U.S. at 47. Among those situations are cases "in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him." *Id.* Johnson acknowledges that neither of those scenarios are implicated on the facts alleged.

JJohnson relies upon a different line of cases in asserting that Jordan was not a "neutral and detached decisionmaker." Specifically, Johnson leans heavily upon the Supreme Court's decision in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). In *Caperton*, the Supreme Court discussed two instances where courts have concluded that recusal is necessary. First, recusal is necessary where the judge has a financial interest in the case's outcome. *Id.* at 877. Second, recusal is required "where a judge had no pecuniary interest in the case but was challenged because of a conflict arising from his participation in an earlier proceeding." *Id.* at 880. The original, landmark case in this second line of authority is *In re Murchison*, 349 U.S. 133, 138 (1955). In

*Murchison*, the question was whether a criminal contempt proceeding "where the same judge presiding at the contempt hearing had also served as the 'one-man grand jury' out of which the contempt charges arose" complied with due process. *Id.* at 134. The Supreme Court held that it did not.

In describing *Murchison*, the *Caperton* Court emphasized several aspects of the opinion. First, the *Murchison* opinion recited the general rule that "no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome." *Capterton*, 556 U.S. at 880 (quoting *Murchison*, 349 U.S. at 136). But the *Murchison* Court also recognized that the interests which require recusal "cannot be defined with precision" and so "[c]ircumstances and relationships must be considered." *Murchison*, 349 U.S. at 136. According to the *Capterton* Court, two facts in *Murchison* were "of critical import": "The judge's prior relationship with the defendant, as well as the information acquired from the prior proceeding." *Capterton*, 556 U.S. at 881.

In *Mayberry v. Pennsylvania*, 400 U.S. 455, 466 (1971), another case cited in *Caperton*, the Supreme Court held that the due process clause was violated when a judge who have been subject to "highly personal aspersions" presided over the criminal contempt proceeding arising out of those insults. The *Mayberry* Court found that the due process clause would be complied with "only if the judgment of contempt is vacated so that on remand another judge, not bearing the sting of these slanderous remarks and having the impersonal authority of the law, sits in judgment on the conduct of petitioner as shown by the record." *Id.*

In its discussion of this area of law, the *Caperton* Court emphasized, however, that "'not every attack on a judge . . . disqualifies him from sitting.'" 566 U.S. at 881 (quoting *Mayberry*, 400 U.S. at 465). Rather, "[t]he inquiry is an objective one. The Court asks not whether the judge

is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Id.* In *Caperton*, the Supreme Court held that "there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." *Id.* at 884. In so holding, the Supreme Court took care to remind that "the Constitution requires recusal" only in "extreme" and "extraordinary" situations. *Id.* at 887. "[M]ost disputes over disqualification will be resolved without resort to the Constitution." *Id.* at 890.

Because Johnson's allegations do not involve a scenario where fundraising in an electoral campaign might have influenced Jordan's (or Morales's) decision, *Caperton* is not directly applicable. Although the opinion provides a broad overview of the applicable principles to consider, it provides limited guidance regarding whether Johnson's present allegations identify an unconstitutional risk of bias.

Rather, the Supreme Court's decision in *Withrow* appears to provide more tailored guidance. The district court in *Withrow* granted a preliminary injunction which prevented the state medical examining board from adjudicating the suspension of a doctor's license because the board had investigated the charges in question and thus would be reviewing its own investigative decision. 421 U.S. at 46. The *Withrow* Court addressed "[t]he contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication." *Id.* at 47. The Supreme Court reasoned that such an argument has a "difficult burden of persuasion to carry":

> It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological

tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Id.*

Relying upon that presumption of honesty and realistic appraisal of risk, the Supreme Court concluded that "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation." *Id.* at 58. And the *Withrow* opinion further held that "[t]he mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing." *Id.* at 55.

In *Withrow*, the Supreme Court cited two cases which answered "a very different question." *Id.* at 58 n. 25. In *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), and *Morrissey v. Brewer*, 408 U.S. 471 (1972), the Court held that "when review of an initial decision is mandated, the decisionmaker must be other than the one who made the decision under review." *Withrow*, 421 U.S. at 58 n. 25. Both *Gagnon* and *Morrissey* involved parole revocation proceedings. In *Morrissey*, the Supreme Court held that "when review of an initial decision is mandated, the decisionmaker must be other than the one who made the decision under review." 408 U.S. at 485. In *Gagnon*, the Supreme Court concluded that when a parole officer recommends revocation of parole, he cannot also serve as "counsellor to the probationer or parolee" without violating the parolee's due process rights. 411 U.S. at 785.

Thus, the Supreme Court has drawn a distinction between situations where the same entity conducts both an investigation and then a later adjudication (which does not, per the *Withrow* Court, necessarily violate due process) and a scenario where "review of an initial decision is mandated," and the initial decisionmaker reviews and evaluates his own prior decisions. The cases

involving the latter scenario dealt with parole revocation proceedings. The extent to which the rationale advanced in those cases is equally applicable to *administrative* proceedings where a person's liberty is not at stake is unclear.

**ii.**

Johnson asserts that an unconstitutional risk of bias was created, first, because Jordan is Morales's subordinate. "[G]iven the professional closeness between the commissioner and his immediate deputy," Johnson argues that Jordan's decision could not have been free of bias. In support of this theory (which she describes as "command influence"), Johnson relies primarily on two cases. The first, *State v. Kelly*, is a West Virginia Supreme Court case from 1960. 112 S.E.2d 641 (W. Va. 1960). In *Kelly*, the Commissioner of the Department of Motor Vehicles, with an inspector, visited Harry Ellis's used car lot. The Commissioner's investigation led him to believe "that relator was not complying with the requirements of the statutes relating to the operation of such a business." *Id.* at 642. A hearing was held to determine whether Ellis's used car dealer's license should be revoked. The Deputy Commissioner of the Department of Motor Vehicles "held the hearing, made the findings of fact, and entered the order canceling the certificate and the authority to use the special plates, though the commissioner personally conducted the investigation and personally testified before his deputy." *Id.* at 643. Ultimately, the license was revoked. After Ellis brought suit, the West Virginia Supreme Court held that the deputy commissioner became "biased and prejudiced" because his superior conducted the investigation and testified at the hearing. *Id.* at 644.

The second case Johnson relies upon is *Mayer v. Montgomery Cty.*, 794 A.2d 704, 709 (Md. Ct. App. 2002). In *Mayer*, the plaintiff had applied for a promotion to the rank of lieutenant within the Montgomery County Police Department. *Id.* at 706. After being denied the promotion,

Mayer filed a grievance with the Montgomery County Office of Human Resources, alleging that his examiners were incompetent. Mayer then received a "Step II" response from the director of the Office of Human Resources denying the grievance. Mayer appealed that grievance to the Chief Administrative Officer for the county, who designated a Human Resources Specialist (and a subordinate of the director who wrote the "Step II" response) to conduct that hearing. Mayer argued that the hearing would be biased by "command influence" because it would be conducted by a subordinate of the "Step II" decisionmaker, but that objection was overruled. At the hearing, Mayer's grievance was denied. Then, Mayer appealed to the County Board, which affirmed the denial.

On appeal, the state appellate court found that Mayer did not receive due process. The court explained:

> [W]hen, in such a process, the Step III hearing officer is a subordinate of the Step II responder, there is a substantial likelihood that the hearing officer's view of the case will be tainted and that he therefore will not render an impartial decision; and even if there is no actual partiality, the process appears not to be impartial. A grievant in the appellant's position reasonably would think that the Step III hearing officer's interest in pleasing his superior, the Step II responder, by resolving the grievance as the Step II responder did, would interfere with his ability to make a neutral decision. In either case, the process is not "fair," as required by the governing statute, regulations, and rules.

*Id.* at 714.

The *Mayer* opinion distinguished between cases where the same agency conducts both adjudicatory and enforcement functions, noting that such a combination is not "essentially unfair." *Id.* at 715. But the court concluded that the current case was different because "the Step II responder and the Step III hearing officer engaged in nearly an identical adjudicatory-type function. In that situation, in which the second decision-maker is literally "second guessing" the

decision of the first decision-maker, who is his superior, the process appears destined for a particular result from the start." *Id.*

In *Maryland Ins. Com'r v. Cent. Acceptance Corp.*, the Court of Appeals of Maryland (the State's highest court) addressed a similar issue and, although it did not expressly overrule *Mayer*, it limited its reach. 33 A.3d 949 (Md. 2011). In *Central Acceptance*, the Maryland Insurance Commissioner ordered a company to cease and desist from charging interest above the statutory maximum on certain consumer loans. The company requested a hearing and further requested that the case "be transferred to the Office of Administrative Hearings." *Id.* at 953. The Commissioner denied the transfer request and "delegated hearing authority to an Associate Deputy Insurance Commissioner ("ADIC")." *Id.* The ADIC affirmed the issuance of the cease and desist order.

The *Central Acceptance* opinion overruled a lower court finding that *Mayer* controlled. Rather, the *Central Acceptance* Court distinguished *Mayer* factually: "Unlike *Mayer*, the ADIC's hearing was not an 'identical adjudicatory-type function' to what the Commissioner engaged in leading to the issuance of the Cease–and–Desist Order." *Id.* at 959. The Maryland Court of Appeals further held that "[w]ere the ADIC subject to the Commissioner's 'command influence,' and Respondents have not shown that she was, judicial review would cure any errors of law." *Id.* at 960. The *Central Acceptance* opinion reaffirmed its prior holdings that "the combination of adjudicatory and investigatory functions in an agency is not, per se, a violation of due process," *id.* at 961, and explained that "[s]imply because the ADIC was delegated by the Commissioner to conduct the hearing does not make her a fortiori a slavish lapdog subject to the Commissioner's will." *Id.* at 963. Rather, the court explained that it begins with the "presumption that the ADIC conducted the MIA hearing with honesty and integrity" and that found that "Respondents simply have not overcome the presumption." *Id.*

Johnson also identifies two cases from the Eastern District of Michigan. In *Walker v. Hughes*, the district court held that a federal prison's procedures for internal discipline proceedings were constitutionally inadequate. 386 F. Supp. 32, 41 (E.D. Mich. 1974). Specifically, the court concluded that "from the adjustment committee must be excluded any employee who investigated the incident, as well as the accused inmate's caseworker (because of the confidentiality of the relationship)." *Id.* For that, and other reasons, the district court held that due process had been violated. But, in her brief, Johnson does not note that *Walker* was reversed by the Sixth Circuit. In holding that the existing procedures complied with due process, the Sixth Circuit explained that "due process required only an Adjustment Committee that did not present a hazard of arbitrary decision making." *Walker v. Hughes*, 558 F.2d 1247, 1258 (6th Cir. 1977). There was no hazard because "[n]either the reporting nor the investigating officer could be a member of the Adjustment Committee." *Id.* Additional restrictions were not necessary.

In *Colligan v. United States* (which predates both *Walker* decisions), the district court held that prison authorities sitting on adjustment committee hearings "should not have any prior connection with the case, nor should those sitting be in a supervisory or subordinate position to those bringing the charges. This is necessary to eliminate the possible 'command influence' which would otherwise be inherent in such a situation." 349 F. Supp. 1233, 1237 (E.D. Mich. 1972). *But see Pearson v. Townsend*, 362 F. Supp. 207, 221 (D.S.C. 1973) (declining to follow *Colligan* and adopt a "command influence" theory because the controlling Supreme Court cases did not espouse such a requirement). Given the Sixth Circuit's decision in *Walker*, the two prior district court opinions which Johnson cites are of questionable significance. *See Walker*, 558 F.2d at 1258 ("The district court ordered eleven procedural rights to be provided inmates in the plaintiff class, but of those listed, the rights we find to be required by due process were already available.").

### iii.

To summarize, Johnson relies upon a number of non-controlling cases in support of her theory that the subordinate-superior relationship between Jordan and Morales offends due process. Each case which Johnson relies upon is either factually distinguishable or has been substantially undermined by later appellate opinions. *Kelly* is a state case with substantially different facts. Unlike there, Morales did not personally testify before Jordan at the hearing or otherwise involve himself in the post-suspension proceedings. *See also Stadium Motors, Inc. v. New York City Dep't of Consumer Affairs*, No. CV07-3120(CPS), 2007 WL 2288040, at *4 n. 22 (E.D.N.Y. Aug. 8, 2007) (distinguishing *Kelly* and noting that other courts have disregarded similar risks of command influence). *Mayer* involved a subordinate reviewing her superior's adjudicative decision. But, as noted in *Central Acceptance*, due process is not violated where the superior engaged in investigation, as opposed to adjudication. And, as held in *Central Acceptance*, the mere fact that delegation occurred does not establish that the subordinate became a "slavish lapdog subject to the [supervisor's] will." 33 A.3d at 963.

Likewise, the two opinions from the Eastern District of Michigan which Johnson cites are not persuasive. To begin with, their rationale was undermined, if not directly overruled, by the Sixth Circuit's decision in *Walker*. At best, *Walker* might be read as suggesting that an investigative officer should not also preside over disciplinary proceedings in a federal prison. But there is reason to limit that holding to that factual context. As explained above, the Supreme Court has directly and unequivocally held in the administrative proceeding setting that "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation" and "[t]he mere exposure to evidence presented in nonadversary investigative

procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing." 421 U.S. at 55, 58.

When the broader context of the law (and Johnson's allegation) is considered, the permissibility of the procedures Johnson now challenges become apparent. First, "[t]he Due Process Clause demarks only the outer boundaries of judicial disqualifications." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986). Recusal from an adjudicatory decision is constitutionally required only in "extraordinary" and "extreme" situations. *Caperton*, 566 U.S. at 887. Accordingly, courts are to be cautious before concluding that allegations of bias and partiality rise to constitutional significance.

Second, the Supreme Court has identified a presumption of "honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47. And that presumption is not rebutted even if the same individual performed roles in both the investigative and adjudicative processes. *Id.* Rather, more must be shown: "special facts and circumstances" which demonstrate "that the risk of unfairness is intolerably high." *Id.* at 58. Of all the cases reviewed, *Withrow* is the most factually similar. The present case arises from the suspension of a business license; *Withrow* involved the suspension of a medical license. In *Withrow*, the same board conducted an investigation and then held a contested hearing on the charges that resulted from its investigation. That dynamic was not constitutionally suspect.

Here, there is even less "risk of unfairness." One individual, Timothy Morales, issued an order suspending Johnson's business license. Because Morales signed that order, it is plausible that he conducted an investigation into the allegations underlying the order. That fact is unexplored in the complaints which have been filed. Thus, the Court can only speculate as to the extent of Morales's involvement in and knowledge of that investigation. But even assuming significant

involvement, *Withrow* establishes that more than "the combination of investigative and adjudicative functions" is needed to offend due process. *Id.* at 47. More importantly (and as revealed in Johnson's proposed amended complaint), Morales did not actually sit on the appeal panel. Thus, Morales had absolutely no direct involvement with the adjudicative process: he did not testify at any of the hearings, he did not issue written opinions, and he did not preside over any hearings.

The only possible suggestion of bias comes from Morales's position as city manager. For the reasons explained above, the rationale of the few, non-controlling cases which have considered the command influence theory will not be adopted. To begin with, the assumption that a subordinate/superior relationship, without more, affirmatively establishes an intolerably high risk of unfairness during administrative proceedings is inconsistent with the presumption of "honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47. It is uncharitable to assume that Jordan could not fairly and impartially consider the propriety of the suspension, despite his superior's involvement in the initial investigation. *See Cent. Acceptance Corp.*, 33 A.3d at 963. Indeed, if (per *Withrow*) an individual could constitutionally be involved both in the initial investigation and then later in the adjudicative proceeding, then the current situation does not offend the Constitution. Here, the connection between the investigator and the adjudicator is yet another step removed: Morales was involved in the investigation, but only his subordinate participated in the adjudication.

Johnson has not alleged that Morales attempted to insert himself into the adjudicative proceedings in any manner. There is no allegation that Morales directed Jordan to reach a certain result or that Morales suggested there might be consequences for reaching a certain conclusion. There are, in fact, no allegations which would suggest that Morales had any interest in the outcome

of the hearing other than his general, professional obligation to ensure the safety of the people of Saginaw. In other words, there is no reason to believe that Morales and Jordan have acted with anything other than honesty and integrity.

One implication of Johnson's argument appears to be that, as Morales's subordinate, Jordan will be biased in favor of the city policy established by Morales. But that argument is contradictory to the Sixth Circuit's decision in *Hammond v. Baldwin*, 866 F.2d 172, 177 (1989) ("[T]he entire government of a state cannot be disqualified from decisionmaking on grounds of bias when all that is alleged is a general bias in favor of the alleged state interest or policy."). As city manager, all city employees could conceivably be considered Morales's subordinates. Given that fact, it would be absurd to conclude that no city employee could review a decision issued by the Office of the City Manager without violating due process. The City of Saginaw did not deprive Johnson of due process when it designated Jordan as the hearing officer.

Johnson also argues (in her amended complaint) that due process will be violated if Timothy Morales is seated on the panel reviewing Jordan's decision. As discussed above, that procedure appears to be consistent with *Withrow* in the absence of additional evidence of bias or partiality. And, more importantly, Johnson now admits that Morales did not, in fact, sit on the panel. As such, the City Ordinance permitting Morales to sit on the panel is not unconstitutional on its face or as it was applied in this particular case.

Finally, Johnson argues that due process was violated because the City of Saginaw was represented at the hearing by attorneys who had previously served as personal legal counsel for Jordan. Am. Compl. at 6. Neither party has briefed this issue. But Johnson has not alleged how that prior relationship prevented Jordan from being a "neutral and detached" adjudicator. More importantly, in the identified case, Jordan was being sued, along with the City of Saginaw, in his

capacity as a city employee. His attorneys served as counsel for all four named Defendants. Given this factual context, there is no reason to believe that Jordan was influenced by his prior relationship with the counsel for the City of Saginaw, much less that any such influence resulted in unconstitutional process. *See generally Prichard v. Lafferty*, 974 F.2d 1338 (6th Cir. 1992) (holding that due process was not violated when a school board asked one of its attorneys to act as officer for a hearing regarding whether to suspend the superintendent).

**2.**

Johnson's other two claims challenge the lack of a pre-deprivation hearing and the burden of proof required by the city ordinance. In Count Two of the amended complaint, Johnson alleges that her due process rights were violated because her business license was suspended, in the absence of "emergency or exigent circumstances," without a predepravation hearing. Am. Compl. at 7.

**i.**

As explained above, the City of Saginaw Code of Ordinances, § 110.06(F), provides that if "the City Manager or their designee" determines that an immediate suspension of a business license is necessary, they may unilaterally order an immediate suspension. But the City Manager or their designee must hold a hearing within five days to allow the license holder to challenge the suspension. *Id.* That procedure was followed in this matter. Importantly, Johnson does not challenge the adequacy of the post-deprivation hearing (except to argue that Jordan was not a neutral and detached arbiter).

Johnson's challenge is premised solely on the fact that her business license was suspended before a hearing was held. Due process requires that "some form of hearing" must be held "before an individual is *finally* deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333

(1976) (emphasis added). However, the Supreme Court has consistently emphasized that "'[d]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Id.* at 334 (quoting *Morrissey*, 408 U.S. at 481). For that reason, the determination of whether administrative procedures comport with due process requires "analysis of the governmental and private interests that are affected." *Id.*

It is well settled that a pre-deprivation hearing is not always required by due process. *See e.g., United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 486 (6th Cir. 2014). *See also Matthews*, 424 U.S. at 343 (identifying "the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action"). However, "exceptions to the general rule requiring predeprivation notice and hearing" are appropriate only in "'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972)). Exceptions to the predeprivation hearing requirement include "situations where a government official reasonably believed that immediate action was necessary to eliminate an emergency situation," *United Pet Supply, Inc.*, 768 F.3d at 486, and "situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake." *Zinermon v. Burch*, 494 U.S. 113, 132 (1990). And the Supreme Court has held that "[t]he demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective." *Opp Cotton Mills v. Adm'r of Wage & Hour Div. of Dep't of Labor*, 312 U.S. 126, 153 (1941).

Thus, the applicability of the predeprivation hearing requirement is fact-specific. The factors to consider in determining whether the requirement should be excused in a particular

situation were identified in *Matthews v. Eldridge*. In that opinion, the Supreme Court provided

three guiding factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.[4]

In considering the first factor, the *Matthews* Court noted several relevant considerations. First,

"temporary" deprivations necessarily involve a lesser private interest than "permanent"

deprivations. *Id.* at 340. Second, "the degree of potential deprivation that may be created by a

particular decision" must be considered. *Id.* at 341. Third, courts should consider "'the possible

length of wrongful deprivation.'" *Id.* (quoting *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975)).

There can be no dispute that Johnson was deprived of a property interest when her business

license was suspended. "[T]he property interest in a person's means of livelihood is one of the

most significant that an individual can possess." *Ramsey v. Bd. of Educ. of Whitley Cty., Ky.*, 844

F.2d 1268, 1273 (6th Cir. 1988). Without the license, Johnson is prevented from operating her

business, thus depriving her of her primary source of income. However, the suspension which

Johnson challenges in Count Two (the pre-hearing deprivation) was temporary. The business

license was originally suspended on May 8, 2017, and the hearing on the suspension was held on

May 11, 2017. If the City of Saginaw has suspended Johnson's business license permanently

---

[4] Because *Opp Cotton Mills* predates *Matthews*, it is unclear whether it is controlling. The best approach appears to be to view *Matthews* as superseding *Opp Cotton Mills* in establishing a generalized analysis for determining due process requirements in a given situation. However, *Opp Cotton Mills* remains persuasive authority for the proposition that the *Matthews*-balancing test does not require a predeprivation hearing in this context.

without providing a hearing, due process would have been undeniably violated. But the temporary suspension which occurred here necessarily implicates a lesser property interest.

In *Goldberg v. Kelly*, the Supreme Court held that welfare recipients have an exceedingly important property interest in their benefits because those benefits provide the "means to obtain essential food, clothing, housing, and medical care." 397 U.S. 254, 264 (1970). Accordingly, a predeprivation hearing was required because even a temporary suspension of those benefits would make the recipient's situation "immediately desperate." *Id.* In contrast, the Sixth Circuit in *Shoemaker* held that $600 dollars in fines and fees constituted a "relatively minor" property interest because "Shoemaker did not go hungry or lose his house because of the $600 added to his property taxes." *Shoemaker v. City of Howell*, 795 F.3d 553, 561 (6th Cir. 2015).

Johnson's property interest in four days of income from her café, though discernible, is "relatively minor." *Shoemaker v. City of Howell*, 795 F.3d 553, 561 (6th Cir. 2015). Given the short length of the deprivation, there is no reason to believe that Johnson was placed in a "desperate" situation or suffered a significant hardship. *Id.* ("Shoemaker did not go hungry or lose his house because of the $600 added to his property taxes in fees and fines."). To be sure, Johnson's temporary loss of income is a constitutionally significant deprivation. But, compared to other cases addressing predeprivation due process requirements, the private interest affected here is minor.

The second factor to consider is the risk of an erroneous deprivation and the probable value added by additional safeguards or procedures (like a predeprivation hearing). In her complaint, Johnson repeatedly alleges that neither she nor her customers did anything wrong on the night of the shooting. Given that fact, she alleges that the license suspension was a misdirected penalty. Instead of punishing the shooters, the City of Saginaw harmed her business. At this stage, these factual allegations are assumed to be true. As such, there was undoubtedly some risk of erroneous

deprivation. At the time Morales suspended Johnson's business license, it had not been conclusively established that Johnson's café was culpable or that the suspension was necessary to protect the public.

But there is no reason to believe that a predeprivation hearing would have significantly decreased the risk of erroneous deprivation. Given the type of crime committed on the property, the City of Saginaw needed time to process the crime scene, investigate the perpetrators, determine why the shooting occurred, and consider whether future shootings were likely. The City of Saginaw's response to the shooting would thus have necessarily involved a period of investigation. And, until at least a preliminary investigation was completed, there would have been little benefit from holding a hearing. If the hearing was held on the Monday after the shooting (when Johnson's license was suspended), it is unlikely that either the City or Johnson would have had sufficient time to adequately investigate the circumstances surrounding the shooting. The length of time before the hearing, five days, seems reasonable in relation to the seriousness of the incident being investigated.

The third factor to consider is the Government's interest in the deprivation. The City of Saginaw has a strong and significant interest both in preventing shootings at local establishments and in prosecuting the perpetrators of such shootings. And, given the serious threat posed by mass shootings, the City of Saginaw has a strong interest in taking steps to prevent further violence before it occurs. The notice of suspension reflected the City of Saginaw's belief that Johnson's café might be the site of further gang-related violence in the future. Am. Compl. at 3. In suspending the business license, the City specifically asserted that the café did not maintain adequate security. Not. Susp. at 1.

Johnson alleges that neither she nor her customers were culpable for the shooting in any way, including in the level of security provided. She further argues that the City of Saginaw should prosecute the shooters, nor her. But given the circumstances, the City of Saginaw could have reasonably concluded that the risk of future criminal activity was unacceptably high. Despite Johnson's argument to the contrary, perpetrators of crimes sometimes cannot easily be apprehended. Even if Johnson was not responsible for the shooting, her café was the site and apparent target. In the immediate aftermath, the City of Saginaw could not have known whether a recurrence was likely. And given the fact that Johnson's café had already been involved in one situation where it had insufficient security to deter a shooting, the City's fear that the café could be the site of additional criminal activity was reasonable.

Especially when dealing with exceedingly serious threats like mass shootings, the City of Saginaw has a strong interest in erring on the side of caution. That interest is especially strong in the immediate aftermath, when the City is processing the crime scene, investigating the crime, and determining whether additional threats were imminent.[5] The City should not be required to expose the public to the possibility of additional attacks at a potentially unsafe location during that investigation.

The Sixth Circuit's decision in *Mithrandir v. Brown* is instructive. 37 F.3d 1499 at *2 (6th Cir. 1994). In *Mithrandir*, two prison guards had been assaulted in less than a month with parts from prisoner typewriters. In response, prison officials temporarily confiscated inmate personal property, including the plaintiff's typewriter, without a hearing. *Id.* at *2. There was no evidence

---

[5] Several courts have held that the government need not provide a predeprivation hearing before it seized animals out of an immediate concern for their safety and well-being. *See United Pet Supply, Inc.*, 768 F.3d 464, 487 (6th Cir. 2014); *Nance v. Humane Soc'y of Pulaski Cty.*, 667 F. App'x 879, 880 (8th Cir. 2016). *A fortiori*, the government must have a strong interest in temporarily infringing property interests when necessary to ensure the safety and well-being of humans.

that the plaintiff or his typewriter had been involved in the prior assaults. Nevertheless, the Sixth Circuit held that no notice or hearing was required before the confiscation because an emergency situation existed. *Id.* Similarly, Johnson alleges that she was not the cause of the shooting. But the café was the site of the shooting. Given the circumstances, additional criminal activity was possible. In both *Mithrandir* and here, the deprivation was a reasonable and proportional response to a serious threat.

In short, Johnson's property interest here is relatively minor. Although Johnson is understandably perturbed at the loss of four days of income, this temporary suspension of her business license did not place her in a significant hardship. Further, an adversarial hearing was held three days after the suspension, thus expeditiously providing due process protections. On the other hand, a predeprivation hearing on May 8, 2017, would likely not have lowered the risk of an erroneous deprivation. At that point, neither the City nor Johnson could have reasonably finished their investigation into the shooting, much less prepared arguments regarding whether public safety necessitated the suspension. And, given the risk of further violence, the City had a strong interest in not waiting until it completed its investigation before suspending the business license.

Considering the relatively confined property interest at issue here, the strong public interest, and the brief period of deprivation, this is a situation where a predeprivation hearing would be "unduly burdensome in proportion to the liberty interest at stake." *Zinermon*, 494 U.S. at 132 (citing *Ingraham v. Wright*, 430 U.S. 651, 682 (1977)). Accordingly, Morales's decision to immediately suspend Johnson's business license pending a hearing three days later did not violate due process. *See Barry v. Barchi*, 443 U.S. 55, 65 (1979) (holding that the state's interest in "preserving the integrity of the sport and in protecting the public from harm" sufficiently outweighed a horse trainer's interest in avoiding suspension such that the trainer's license could

be revoked without a prior hearing); *R. A. Holman & Co. v. Sec. & Exch. Comm'n*, 299 F.2d 127, 131 (D.C. Cir. 1962) ("In a wide variety of situations, it has long been recognized that where harm to the public is threatened, and the private interest infringed is reasonably deemed to be of less importance, an official body can take summary action pending a later hearing.").

**ii.**

Finally, Johnson alleges in Count Three of the amended complaint that the City of Saginaw Code of Ordinances § 110.06(D) unconstitutionally places the burden of proof on her to show that the suspension is unwarranted. Section 110.06(D) states that, at the public hearing, "the licensee or permittee shall be granted an opportunity to show cause why the license or permit should not be suspended, revoked, or denied renewal." *Id.*

This claim is present both in the amended complaint and in the proposed second amended complaint. Defendants argue that both claims are infirm, but do not cite legal authority for that proposition. And Johnson has not directly addressed this claim in any of her briefs. Thus, the legal basis for this claim is entirely undeveloped.

Johnson alleges that § 110.06(D) violates due process by placing the burden of persuasion on her. But that kind of burden shifting is not a prima facie violation of due process. "'[T]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary.'" *Campbell v. United States*, 365 U.S. 85, 96 (1961) (quoting *United States v. New York, N.H. & H.R. Co.*, 355 U.S. 253, 256 n. 5 (1957)). Typically, this means that the party seeking relief will bear the burden of persuasion. However, the burden of proof does not invariably follow the burden of pleading. *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 494 n.17 (2004) (citing § 337, *Allocating the burdens of proof*, 2 McCormick On Evid. (7th ed.)). Exceptions exist. For example, defendants sometimes

bear the burden of proving affirmative defenses. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) (citing *FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948)). And the *Schaffer* Court appeared to recognize that legislatures may create exceptions to the general rule that the party seeking relief bears the burden of persuasion. *Id.* at 57–58 ("Absent some reason to believe that Congress intended otherwise, therefore, we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.").

Accordingly, there is no immediately apparent support for the proposition that due process requires the burden of proof to be placed on the party seeking relief in all instances.[6] To the contrary, exceptions to that general rule are well-established. And one exception, legislative intent, applies here. Thus, § 110.06(D) appears facially compatible with minimum due process requirements.

Additionally, § 110.06(D) appears to place only a nominal burden of proof on Johnson. The ordinance establishes no presumption that the original suspension was appropriate. The party seeking reinstatement of the license is merely tasked with showing why the business is not threatening the public health, morals, safety, or welfare. That standard appears coterminous with the "preponderance of the evidence" standard. Applied in this context, the hearing officer must simply decide whether the petitioner has shown that it is more likely true than not that the business is no threat to the public. In a criminal proceeding, this allocation of the burden of proof would be unconstitutional. But the present circumstance involves an administrative proceeding regarding a property interest. The United States Constitution guarantees *minimum* due process protections, and Johnson has provided no rationale for why the City of Saginaw's legislative determination

---

[6] Here, Johnson is seeking relief from the order suspending her business license. But because she has a property interest in the license and it was suspended without prior hearing, it seems appropriate to construe the City of Saginaw as the party seeking affirmative relief (a change in the status quo).

regarding the appropriate allocation of the burden of proof in these proceedings offends those outer boundaries of permissible procedure.

## B.

The final motion to resolve is Johnson's motion for leave to file a second amended complaint. As addressed above, leave to amend should be granted only if amendment would not be futile. Defendants argue that amendment would be futile because each of the claims in the proposed second amended complaint fail as a matter of law. Johnson's claims will be addressed in order.[7]

## 1.

In Count One of the proposed second amended complaint, Johnson argues that the City of Saginaw Code of Ordinances § 110.06(E) is unconstitutional for several reasons. That section permits a party dissatisfied with the decision of a hearing officer to appeal the decision. The appeal hearing is "held before a panel consisting of the City Manager or their designee, the affected department head or their designee, and the City Clerk or their designee." *Id.* at § 110.06(E)(2).

Johnson argues, first, that the appeal panel contained non-neutral and non-detached decision makers because at least one was appointed by a direct supervisor. That "command influence" theory was addressed above. As explained, a subordinate/superior relationship, without more, is insufficient to overcome the presumption that decision makers will adjudicate with honesty and integrity.

---

[7] Johnson's motion for leave to file a second amended complaint contains only a two page brief. And Johnson has declined to file a reply brief opposing Defendants' arguments that amendment would be futile. Johnson has thus made no attempt to rebut Defendants' assertion that she has failed to state a claim. In this context, Johnson's factual allegations will be accepted as true and her legal claims liberally construed. But there is, of course, a limit. Johnson's legal assertions need not be accepted as true. *Iqbal*, 556 U.S. at 678–79.

Second, Johnson argues that the composition of the appeal panel violated due process because the panelists lacked "training, experience, and/or education to understand and properly adjudicate the factual and legal arguments." Prop. Sec. Am. Compl. at 8. The minimum requirements of due process do not mandate that a hearing body be composed of attorneys. Rather, Johnson was entitled to a "'neutral and detached' hearing body such as a traditional parole board, *members of which need not be judicial officers or lawyers*." *Morrissey*, 408 U.S. at 489 (emphasis added). This case involves relatively simple facts, and there is no reason to believe that the members of the appeal panel would have been unable to adequately understand the relevant issues and standards.

Third, Johnson argues that § 110.06(E) is unconstitutional because it provides "unstructured, unlimited, and arbitrary discretion" to the appeal panel in reviewing the hearing officer's decision. Prop. Sec. Am. Compl. at 8. Johnson is correct that § 110.06(E) does not expressly define the standard of review which the appellate panel should apply. Section 110.06(E)(3) states that the "factual record made in the hearing . . . shall constitute the basic record for the appeal." But the appeal panel is also permitted to hear and consider "additional evidence" and argument. *Id.* The fundamental requirements of due process do not require administrative appellate proceedings to be strictly structured. Rather, the general principle appears to be that "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey*, 408 U.S. at 481. Simply put, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests

involved and the nature of the subsequent proceedings." *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971).

Above, the *Matthews v. Eldridge* factors were considered in addressing whether due process required a predeprivation hearing. For similar reasons, the relatively informal administrative appellate proceedings here were consistent with minimum due process requirements. Johnson undoubtedly has a strong interest in retaining her business license, but there appears to be little risk of erroneous deprivation because of § 110.06(E)'s undefined standard of review. Johnson had the benefit of both an adversarial hearing and an appeal of that decision. The statute's admittedly ambiguous language appears to provide the appeal panel full authority to consider additional evidence and legal arguments. Section 110.06(E) does not create any kind of presumption in favor of the hearing officer's original decision (though such a presumption would not necessarily be inconsistent with minimum due process requirements). Thus, there is no reason to believe that the panel declined to correct any errors in Jordan's original determination because of an unduly deferential standard of review.

At best, Johnson can argue that the standard of review in this setting is less well defined than it would be in a judicial setting. However, "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances." *Matthews*, 424 U.S. at 348. Johnson received two meaningful opportunities to be heard. Municipal administrative proceedings will inevitably be less formal than judicial proceedings, but the process Johnson received here was adequate.[8]

_____

[8] To the extent Johnson might be arguing that § 110.06(E) is ambiguous because the ordinance does not provide standards for determining when a business license should be suspended, she is essentially arguing that the ordinance is void for vagueness. That allegation forms the basis for her second count in the proposed second amended complaint and will be addressed below. Johnson could potentially also be alleging that the appeal panel's decision was arbitrary and capricious. But that argument implicates a *substantive* due process claim. And a substantive due process claim attacking state administrative action is subject to extremely deferential review. *See Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992) ("Where a substantive due process attack is made on state administrative action,

Fourth, Johnson alleges that the appeal panel failed to provide a written statement of its decision. To begin with, the minimum requirements of due process include only "a written statement by the factfinders as to the evidence relied on and reasons for" the decision. *Morrissey*, 408 U.S. at 489. Johnson admits that Jordan provided a written statement indicating his findings of fact. Prop. Sec. Am. Compl. at 6. Because the initial decisionmaker (factfinder) issued a written statement, it is unclear that the appellate review panel was also required to do so. Regardless, Defendants have attached to their response brief a written decision issued by the appeal panel on the day of its decision.[9] Johnson does not contest its authenticity and so appears to have abandoned this claim.

In short, Johnson's first count argues that the appeal panel did not satisfy minimum due process requirements for four reasons. Because none of those four reasons run afoul of basic due process requirements, her first count is deficient as a matter of law.

## 2.

In Count Two, Johnson argues that § 110.06(F) should be found to be void for vagueness. That section permits the city manager to order an immediate suspension of a business license if he

---

the scope of review by the federal courts is extremely narrow. To prevail, a plaintiff must show that the state administrative agency has been guilty of 'arbitrary and capricious action' in the strict sense, meaning 'that there is no rational basis for the ... [administrative] decision.'" (quoting *Stevens v. Hunt*, 646 F.2d 1168, 1170 (6th Cir.1981)). As discussed later in this this opinion, the City of Saginaw's basis for suspending the business license—risk to the public—was rational.

[9] At this stage, the Court typically does not consider factual information from outside the pleadings. But certain exceptions exist, including "exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Additionally, the Court may consider "documents that are public record" and "decisions of a government agency." *Sollenberger v. Sollenberger*, 173 F. Supp. 3d 608, 618 (S.D. Ohio 2016). These exceptions act as "a protection for the defendant, without which 'a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied.'" *Id.* (quoting *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir.1997)). Here, Johnson has not filed a reply brief and thus has not contested the authenticity of the exhibit which Defendants submit. It appears to be both a public record and the decision of a government agency. As such, it will be considered because failure to do so would allow a demonstrably deficient claim to survive a motion to dismiss.

or his designee determines that suspension is "in the interest of the public health, morals, safety, or welfare." *Id.* Johnson alleges that the ordinance is unconstitutional because it "does not provide fair notice of the conduct proscribed." Prop. Sec. Am. Compl. at 8.

Due process requires that legislative enactments not be unduly vague. "Vague laws offend several important values." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Laws should "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* Likewise, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id.* And vague laws are especially problematic if they carry the risk of chilling exercise of First Amendment freedoms. Of course, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). A plaintiff advancing a claim of vagueness must show that "the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). Importantly, "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)).

In the past, the Supreme Court has "struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent"—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Williams*, 553 U.S. at

306. But the Supreme Court has found that application of terms like "training," "expert advice or assistance," "service," and "personnel" do not "require . . . untethered, subjective judgments."

City of Saginaw Code of Ordinances § 110.06(F) authorizes the City Manager to immediately suspend a business license if doing so is "in the interest of the public health, morals, safety, or welfare." Those terms may be imprecise and normative, but they do not prevent citizens of Saginaw from understanding in broad terms what kind of conduct is prohibited. The Sixth Circuit has consistently concluded that similarly kinds of statutory provisions are not unconstitutionally vague. For example, in *United States v. Akzo Coatings of Am., Inc.*, the Sixth Circuit found that a statute which prohibited anyone from discharging a substance into state waters that may become "injurious to the public health, safety, or welfare" was sufficiently specific to conform with due process requirements. 949 F.2d 1409, 1441 (6th Cir. 1991). The present ordinance contains the same language, with the addition of "morals." And the Sixth Circuit has found that similar prohibitions on "immorality" were not unduly vague. *See id.* at 1442 (rejecting the argument that the word "injurious" was unconstitutionally vague because "any legislature desiring to prohibit "immoral conduct," for example, faces the same dilemma because the standard of what constitutes acceptable conduct changes over time" and vagueness challenges to those words have been rejected). *See also Fowler v. Bd. of Educ. of Lincoln Cty., Ky.*, 819 F.2d 657, 665 (6th Cir. 1987) (finding that a prohibition on "conduct unbecoming a teacher" was constitutional and explaining that the "most conscientious of codes that define prohibited conduct of employees includes 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.'").[10]

---

[10] And, importantly, Johnson's license was clearly suspended based on a different basis: public safety.

Thus, the words in the ordinance at issue here have, in other contexts, been held sufficiently specific to comply with constitutional requirements. At best, Johnson can argue that her conduct here is at the outer bounds of conduct that could reasonably be construed as threatening the public safety. But, even if true, more is necessary to demonstrate that a provision is unconstitutionally vague. "'[T]he law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson v. United States*, 135 S. Ct. 2551, 2561 (2015) (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)). In other words, a law is not unconstitutionally vague simply because it calls "for the application of a qualitative standard." *Id.* The mere fact that one can envision difficult cases for application of a statute's language does not mean that the statute is unconstitutionally vague. Rather, close questions of applicability are routinely resolved by judges, juries, and (in the administrative setting) government officials. Section 110.06(F) of the City of Saginaw Code of Ordinances is not unconstitutionally vague.

**3.**

In Count Three, Johnson alleges that the City of Saginaw has engaged in selective enforcement. In making that argument, Johnson relies on two examples. On September 8, 2017, "gun fire erupted as Dom's Food Market . . . in Saginaw, Michigan." Prop. Sec. Am. Compl. at 9. According to a news article which Johnson attaches to the proposed second amended complaint, a 41-year-old man was shot several times as he was leaving the business and was pronounced dead on the scene. *Id.* at Ex. G. Similarly, on October 15, 2017, "gun fire erupted at Covenant Healthcare, in Saginaw Michigan." *Id.* at 9. According to the news article which Johnson relies upon, an elderly patient fired a single shot, injuring no one. *Id.* at Ex. H. The City of Saginaw did not suspend or terminate the business license of the corresponding businesses after either incident. Johnson contends that the disparity in the treatment of the café and other Saginaw business that

have been the location of gun violence "is due to an unjustifiable standard premised on an arbitrary classification not authorized by law." *Id.* at 10.

> A selective-enforcement claim requires proof of the following elements:
>
> First, [the state actor] must single out a person belonging to an identifiable group, such as ... a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, he must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Libertarian Party of Ohio v. Husted*, 831 F.3d 382, 394–95 (6th Cir. 2016) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)), cert. denied, 137 S. Ct. 651, 196 L. Ed. 2d 523 (2017). "[T]here is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary." *Stemmler*, 126 F.3d at 873. Accordingly, "'the standard is a demanding one.'" *Id.* (quoting *United States v. Armstrong,* 116 S.Ct. 1480, 1486 (1996)).

Johnson's allegations fall far short of overcoming the presumption that the City officials have fairly and impartially discharged their official duties. None of the complaints include any allegations that Johnson is a member of a protected class or that the examples of disparate treatment included a different group of citizens. Because Johnson has not alleged that she is a member of an identifiable and protected group (much less that she was discriminated against on that basis), her selective enforcement claim appears to fail on the first element. At best, Johnson might rely upon the "class of one" theory recognized in *Vill. of Willowbrook v. Olech*, where the Supreme Court concluded that if a "plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the different in treatment," an equal protection claim may be brought. 528 U.S. 562, 564 (2000). But *Olech* has been significantly

undermined by *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 603 (2008). As the Supreme Court explained:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id.*

This appears to be one such instance. And even if the rational basis standard applies, Johnson has nevertheless failed to meet the demanding standard necessary to overcome the presumption that the government actors acted properly. The basis by which the City of Saginaw might rationally choose to treat the shooting at Johnson's café differently from the other incidents she identifies is apparent. The City of Saginaw concluded that the shooting at Johnson's café was "gang-related, involving gangs from the 'southside' and 'northside' of Saginaw." Prop. Sec. Am. Compl. at 3. Johnson's allegations regarding the food market and Covenant Healthcare shootings do not suggest that the violence was gang-related. The City of Saginaw could rationally conclude that gang-related violence is substantially more likely to recur than other gun-violence, and so that more drastic action was necessary to prevent additional violence at Johnson's café.[11] Taking all well-pleaded factual allegations as true, Johnson has not alleged a cognizable selective enforcement claim.

**4.**

---

[11] Defendants further explain that the City chose to suspend Johnson's license "due to the mix of both alcohol and violence that occurred on her premises and was perpetuated by security working that evening." Resp. Mot. File. Am. Compl. at 8, ECF No. 19. Thus, there were multiple rational bases for the City to treat Johnson's café differently than the other sites of gun violence.

In Counts Four, Five, and Six, Johnson contends that her procedural due process rights were violated. This claims are similar to those brought in her first amended complaint (and rejected above). Because of their similarities to each other and the claims already analyzed, they will be considered together.

**i.**

First, in Count Four, Johnson reiterates her "command influence" theory against Defendant Jordan. As before, she alleges that, because Morales is Jordan's superior, Jordan could not have fairly and impartially reviewed Morales's order of suspension. Now, in the proposed second amended complaint, Johnson alleges additional facts. Specifically, Johnson argues that "[t]he level of professional and command closeness is so acute that Defendant DENNIS JORDAN has to seek permission of Defendant TIMOTHY MORALES to take personal or vacation days during the same time the former was deciding the legality of the latter's decision." Prop. Sec. Am. Compl. at 10–11.

In support of this argument, Johnson attaches a series of emails between Jordan and Morales. The email chain in question originated with a notice, sent on May 24, 2017, from Timothy Morales to all department heads that a meeting had been canceled. Jordan replied:

> Tim,
>
> With your permission, I would like to take Friday off ..I know it is short notice and I apologize for that… I will try not to let this happen again.. If this is OK this time… I appreciate it…

Jordan Email to Morales, ECF No. 15, Ex. F.

Morales responded: "Hi Dennis – that's fine – thanks." *Id.* This email chain is unremarkable. Johnson has already alleged (and Defendants do not contest) that Morales is Jordan's superior. As explained before, that fact alone is insufficient to create a prime facie violation of due process.

This email chain simply reflects normal communications between a supervisor and his subordinate. There is no discussion of the hearing or the license suspension. This email chain does not overcome the presumption that both Morales and Jordan fulfilled their responsibilities regarding the business license suspension with honesty and integrity.

**ii.**

Next, in Count Five, Johnson alleges that "[b]y conducting secret, ex parte communications with Chief Ruth outside the presence or knowledge or Plaintiff, Defendant DENNIS JORDAN violated due process." Prop. Sec. Am. Compl. at 11. Johnson attaches one example and alleges that additional as yet undiscovered emails exist. The email chain which Johnson has attached will be briefly summarized.

On May 19, 2017, Jordan sent Chief Ruth an email:

I am still awaiting the transcripts and the evidentiary documentation that was submitted at the hearing.. I have started to develop my own file of facts in the mean time. Just curious, was the first discussion you had with Rita when she opened ever documented.. like a memo to agree to certain terms?

If so, do you have that or was it submitted as evidence during the hearing?

Jordan Email to Ruth at 2, ECF No. 15, Ex. E.

Chief Ruth replied: "No I don't think it was. We didn't do written agreements at that point. I don't have any notes either. Not sure if anyone else has any notes. It was all verbal." *Id.* Several other involved parties were then contacted to determine if any took notes of the meeting in question. No notes were forthcoming, at least by May 22, 2017. In the last email, Jordan indicated that he was satisfied with the lack of notes: "Chief pretty much summed it up if there was nothing agreed to in writing. I am ok with that." *Id.* at 1.

In making a claim of bias and partiality based on extrajudicial information, Johnson must overcome "the presumption that policymakers with decisionmaking power exercise their power

with honesty and integrity." *Navistar Int'l Transp. Corp. v. U.S. E.P.A.*, 941 F.2d 1339, 1360 (6th Cir. 1991). Further, "any alleged prejudice on the part of the decisionmaker must be evident from the record and cannot be based on speculation or inference." *Id.* In order for it to be disqualifying, "the alleged bias and prejudice . . . must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966).

Johnson's allegations here fall far short of overcoming this presumption. The email chain she relies upon reflects a request for additional evidence corroborating statements which were made at the suspension hearing. Thus, the emails provide no indication of personal bias or animus towards Johnson. To the contrary, the emails reflect Jordan's intention to perform his due diligence in reviewing the suspension. And, importantly, the email chain reflects that no extrajudicial information was received or considered. To the contrary, Jordan ended the email chain by indicating his intention to rely solely on the testimony Chief Ruth gave during the hearing. Thus, Johnson's claim fails on both elements. She has not alleged that Jordan, in fact, received any extrajudicial information and, further, she has not alleged that Jordan actually relied on any such information in making his decision on the merits. The allegations in the proposed second amended complaint, at best, rise to the level of "speculation or inference," but more is required. *Navistar*, 941 F.2d at 1360. *See also England v. Colvin*, No. CV 13-137-GFVT, 2016 WL 1317393, at *5 (E.D. Ky. Mar. 31, 2016) ("England does not point to any evidence that the ALJ's bias actually existed and is not based on speculation, nor does she demonstrate that such alleged bias improperly resulted in an opinion on the merits because of something the ALJ learned apart from the evidence in the record.").

**iii.**

In Count Six, Johnson alleges that her due process rights were violated because the City of Saginaw was represented at the hearing by attorneys who had previously represented Jordan in a separate matter. This claim is materially identical to the one advanced in her first amended complaint. No additional factual allegations have been made in the proposed second amended complaint. Accordingly, the analysis articulated above is equally applicable, and this claim is legally deficient.

**5.**

Counts Seven and Eight of the proposed second amended complaint are likewise materially identical to claims advanced in the first amended complaint. In Count Seven, Johnson argues that he due process rights were violated by the failure to provide a predeprivation hearing. In Count Eight, Johnson argues that § 110.06(D) improperly shifts the burden of proof to her. These claims were fully addressed and found legally inadequate above.

**6.**

Finally, Count Nine advances a substantive due process claim. Specifically, Johnson alleges that "§ 110.06 violates substantive due process in that is [sic] permits the destruction of property interests by a governmental body due to the actions or deeds of third persons over whom Plaintiff has no control but Defendant CITY OF SAGINAW has the legal authority and could itself regulate, criminalized [sic], or properly police these third party law breakers." Prop. Sec. Am. Compl. at 15. Johnson contends that the City's decision to destroy "Plaintiff's business license and property rights in the form of making a livelihood . . . due to the illegal actions of third parties [is] arbitrary and capricious." *Id.* She further asserts that the City's actions do "not bear a substantial or reasonable relation to the public health, safety, morals, or general welfare." *Id.*

Thus, Johnson is claiming that the license suspension was "arbitrary and capricious in that it [did] not bear a substantial relation to the public health, safety, morals, or general welfare." *Pearson*, 961 F.2d at 1216 (6th Cir. 1992).[12] "Where a substantive due process attack is made on state administrative action, the scope of review by the federal courts is extremely narrow. To prevail, a plaintiff must show that the state administrative agency has been guilty of 'arbitrary and capricious action' in the strict sense, meaning 'that there is no rational basis for the ... [administrative] decision.'" *Id.* at 1221 (quoting *Stevens v. Hunt*, 646 F.2d 1168, 1170 (6th Cir. 1981)). Essentially, "[t]he administrative action will withstand substantive due process attack unless it 'is not supportable on any rational basis' or is 'willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case.'" *Id.* (quoting *Greenhill v. Bailey*, 519 F.2d 5, 10 n. 12 (8th Cir.1975)).

> Under the foregoing principles, it is extremely rare for a federal court properly to vitiate the action of a state administrative agency as a violation of substantive due process. The vast majority of such attacks may readily be disposed of on summary judgment, as in the case at bar, thus keeping interference by federal courts with local government to a salutary minimum. Review of state administrative action is primarily a matter for the state courts, which quite properly have a much broader scope of review under state law.

*Id.* at 1222–23.

This is not one of the extremely rare cases where it is appropriate for a federal court to quash the municipal decisions at issue. As has already been explained, the City's decisions were based on multiple rational bases. First, the City believes (and Johnson appears to concede) that the shooters were gang-affiliated. Because gang-violence can be systemic and often centers around

---

[12] Johnson's substantive due process claim might be construed as also asserting that the City of Saginaw's actions "shock the conscience." But "[a]pplying the 'shock the conscience' test in an area other than excessive force is … problematic." *Cassady v. Tackett*, 938 F.2d 693, 698 (6th Cir. 1991) (quoting *Braley v. City of Pontiac*, 906 F.2d 220, 226 (6th Cir.1990)). The present allegations are best construed as a claim that the Defendants' actions were arbitrary and capricious.

the same geographic areas, the City's decision to eliminate one potential location for repeated violence was rational. Similarly, given the seriousness of the crime committed (a mass shooting), and the City's belief that the café's lack of adequate security contributed to the incident, the decision to suspend Johnson's business license was not "willful and unreasoning action."

## C.

In short, none of the Counts in Johnson's first or second amended complaints frame cognizable claims for relief, even assuming all well-pleaded facts to be true. The United States Constitution provides important and fundamental protections of a variety of rights, including the right to not be deprived of property without due process of law. But due process provides only *minimum* requirements. Due process does not guarantee an exhaustive and prolonged opportunity to contest deprivations of property, nor is it a basis for an aggrieved party to challenge the outcome of a legal proceeding after an adverse decision. Rather, most allegations of error in adjudicative proceedings can and should be resolved in appellate proceedings.

Johnson's suit represents an attempt to collaterally attack the suspension of her business license by the City of Saginaw via claims that the City violated her due process rights. In so doing, Johnson requests micromanagement of the administrative procedures promulgated by the City of Saginaw. That request is inconsistent with fundamental principles of federalism. Today, the Court holds merely that the procedures and circumstances whereby Johnson was deprived of her business license did not surpass the outer boundaries of constitutional due process. Johnson may have legitimate grievances regarding the application of the ordinance in her situation, but those

grievances should be resolved, as the ordinance permits, via appeal to a state court of competent jurisdiction, who may then review the merits of the suspension.[13]

**V.**

Accordingly, it is **ORDERED** that Plaintiff Johnson's motion for leave to file supplemental authority, ECF No. 12, is **GRANTED.**

It is further **ORDERED** that Plaintiff Johnson's motion for reconsideration, ECF No. 10, is **DENIED.**

It is further **ORDERED** that Defendants' motion to dismiss, ECF No. 11, is **GRANTED.**

It is further **ORDERED** that Plaintiff Johnson's motion for leave to file a second amended complaint, ECF No. 15, is **DENIED.**

It is further **ORDERED** that the amended complaint, ECF No. 5, is **DISMISSED.**

Dated: December 20, 2017                                    s/Thomas L. Ludington
                                                            THOMAS L. LUDINGTON
                                                            United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 20, 2017.

                              s/Kelly Winslow
                              KELLY WINSLOW, Case Manager

---

[13] *See* City of Saginaw Code of Ordinances § 110,06(E)(4) ("A party aggrieved by the order or decision of the appeal panel may appeal the decision to a court of competent jurisdiction as provided by state statutes and court rules."). *See also* Mich. Const. Art. 6, § 28.