UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RITA R. JOHNSON,

                Plaintiff,              Case No. 17-CV-12405

      v.                          Hon. Thomas L. Ludington

TIMOTHY MORALES,
DENNIS JORDAN, and
CITY OF SAGINAW,

                Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR
SUMMARY JUDGMENT, GRANTING PARTIAL SUMMARY JUDGMENT FOR
PLAINTIFF AS TO COUNTS I AND II AGAINST DEFENDANT CITY OF SAGINAW,
DISMISSING REMAINING COUNTS AGAINST DEFENDANT CITY OF SAGINAW,
AND DISMISSING DEFENDANTS MORALES AND JORDAN**

        This matter is before the Court pursuant to the parties' cross-motions for summary

judgment. ECF Nos. 43, 45. Plaintiff Rita R. Johnson alleges that Defendants City of Saginaw (the

"City"), Timothy Morales, and Dennis Jordan violated her constitutional rights to due process and

equal protection by suspending her business license after a gunfight erupted outside her business

in May 2017. The case was dismissed on December 20, 2017 for failure to state a claim. ECF No.

20. The United States Court of Appeals for the Sixth Circuit reversed the dismissal in part on

January 7, 2021 and remanded the case for further proceedings. ECF No. 24. For the reasons set

forth below, Defendants' Motion for Summary Judgment will be granted in part and denied in part,

Plaintiff's Motion for Partial Summary Judgment will be granted in part and denied in part,

summary judgment will be granted for Plaintiff as to Counts I and II against the City, all remaining

counts against the City will be dismissed, and Defendants Morales and Jordan will be dismissed.

## I.

## A.

In September 2015, Plaintiff Rita R. Johnson founded the restaurant Rita's Southern Soul Food Café (the "Café"). ECF No. 43-4 at PageID.690 (Johnson's deposition). The Café occupied the first floor of a four-story building on Washington Avenue in downtown Saginaw, Michigan. *Id.* at PageID.687. Johnson often rented out the Café for private events and celebrations, including "birthday parties, fashion shows, blues/jazz events" and "things of that nature." ECF No. 43-4 at PageID.688; ECF No. 45-2 at PageID.960 (Johnson's declaration).

One day, a young man named Andrick Pruitt approached Johnson while she was working at the Café. ECF No. 43-4 at PageID.695. Pruitt sought to rent the Café for his birthday party on May 5, 2017. *Id.* Johnson agreed, and the terms of the rental were memorialized in a short contract (the "Agreement") dated April 8, 2017. *See* ECF No. 43-7. As part of the Agreement, Pruitt agreed that no alcohol would be consumed on the premises and that he and his guests would refrain from "illegal behavior." *Id.* at PageID.730. The Agreement also required Pruitt to obtain security for the event—a term that Johnson regularly imposed when the event was for "younger people." *Id.* at PageID.728; ECF No. 43-4 at PageID.696.

Indeed, Johnson had previously experienced trouble when renting the Café to young people. In 2016, Johnson rented the Café to a fraternity from Saginaw Valley State University. ECF No. 43-4 at PageID.698, 706–07. At some point, the event turned rowdy, damaging the Café's furniture and fixtures. *Id.* at PageID.698. Johnson made an insurance claim for the damages. *Id.* at PageID.706. On another occasion, Johnson had to "shutdown" a sorority party after some guests became "very upset." *Id.* at PageID.702. She told the DJ to cut the music, turned on the lights, and directed security to escort the guests out. *Id.* At her deposition, Johnson testified, "[A]ny time I

see imminent danger[,] I shut down." *Id.*

Pruitt arrived at the Café for his birthday party on the night of May 5, 2017 at around 9:00 P.M. ECF No. 43-4 at PageID.703. The party began at around 11:00 P.M. with at least 300 guests, around ten security guards,[1] and a live DJ. ECF No. 43-4 at PageID.698, 701–03. Security was stationed inside the Café, near areas like the dance floor and restrooms. *Id.* at PageID.704. One of the security guards, Deondre Blackmon, testified that security frisked guests at the entrance to prevent alcohol and weapons from being smuggled into the Café. ECF No. 43-9 at PageID.739–40 (Blackmon's deposition). Security would also "go outside periodically to walk around and make sure everything [was] good." *Id.* at PageID.737. Blackmon was armed with PAP M92 pistol,[2] which he slung around his neck, as well as a Glock 23 .40 caliber pistol. *Id.* at PageID.736.

Up until the shooting, the party appeared to encounter little trouble. At around 1:00 A.M., Blackmon escorted two agitated partygoers outside the Café and watched them leave in their vehicles. *Id.* at PageID.735–36. Blackmon testified that the two men had started arguing during the party but denied that they became violent inside. *Id.* at PageID.741–42. Additionally, Johnson recalls Blackmon telling her at some point in the night that some individuals were denied entry to the party because "they were known for being trouble." ECF No. 43-4 at PageID.700.

At around 1:45 A.M., the party was going strong and the musical headliner for the evening—a rapper from Detroit—had not even arrived. *Id.* at PageID.698–99. Blackmon was walking through the crowd on the dancefloor when suddenly "everybody got down." ECF No. 43-

---

[1] The Agreement required at least 10 security guards. ECF No. 43-7 at PageID.728 Saginaw Police Chief Robert Ruth later testified that 18 guards were present. ECF No. 43-10 at PageID.764. Deondre Blackmon, one of the security guards at the party, estimated that the true number was between "eight and ten." ECF No. 43-9 at PageID.739.

[2] Blackmon testified that the PAP M92 "looks like an AK-47." ECF No. 43-9 at PageID.736. Hence, why Blackmon was reported as carrying an AK-47 style assault rifle. *See* ECF No. 43-10 at PageID.764 (describing a security guard with an "AK47 strapped around [his] neck").

9 at PageID.737. Gunfire had erupted across the street from the Café near Temple Theatre. *Id.* Johnson, who was in the kitchen cooking tacos, quickly found herself hiding in the bathroom with frightened partygoers. ECF No. 43-4 at PageID.698. Police arrived minutes later to broken glass, bullet holes, and partygoers scattering through the street. There were no injuries reported from the shooting. ECF No. 43-14 at PageID.800.

During their investigation, police recovered 60 spent shell casings from around the Café. ECF No. 43-10 at PageID.763.[3]   At least one of the casings was recovered near the entrance of the Café, but, during his deposition, Saginaw Police Chief Robert Ruth testified that it may have been inadvertently kicked there during the commotion. ECF No. 43-13 at PageID.789–90.

Police have yet to identify the shooters, and both Johnson and Blackmon deny having seen them.[4]   Chief Ruth testified that at least one shooter was alleged to have fled through the backdoor of the Café, which to him implied that the shooter was already inside or had ran there for safety. ECF No. 43-13 at PageID.790. While his department has made no arrests in the matter, Chief Ruth believes that the shooting was gang related—the product of "[n]orth side and south side gangs [] beefing with each other" after crossing paths at Pruitt's party. ECF No. 43-13 at PageID.793. His belief appears at least partially based on a police interview with a self-proclaimed member of the "Latin Kings" street gang. The gang member was interviewed on the morning of May 7, 2017 at St. Mary's Hospital in Saginaw, about a half-mile from the Café. ECF No. 43-12 at PageID.783.

---

[3] Johnson suggests that some of the casings were recovered too far from the Café to have been related to the shooting. *See* ECF No. 49 at PageID.1113. She notes that some of the casings were recovered near the Saginaw Community Foundation Building, which she describes as being "two city blocks away." *Id.* But, as illustrated by Johnson's own map of the vicinity, the Saginaw Community Foundation Building is a mere two-minute walk from the Café. *See* ECF No. 49-2.

[4] During her deposition, Johnson claimed that she and Blackmon spoke the day after the shooting. ECF No. 43-4 at PageID.699. Blackmon allegedly told her that "he [had] seen the people across the street, they tried to get in and [security] denied them, and they went back across the street[,] [a]nd then the shooting started." *Id.* at PageID.699–700. At his own deposition, Blackmon denied seeing the shooters but suggested that they could have been part of a group of men that had gathered across the street from the Café near Temple Theatre. ECF No. 43-9 at PageID.738–39, 742.

He was being treated for minor injuries he claimed to have sustained during a "beating" by fellow Latin Kings. *Id.* He told police that he was at Pruitt's party and that the shooting was the result of a dispute between north and southside gangs.[5]  *Id.*

## B.

On the following Monday, May 8, 2017, Johnson discovered a notice (the "Notice") from the City on the front door to the Café. *See* ECF No. 43-15. The Notice was entitled "Immediate Suspension of Business Activity." *Id.* As its title would suggest, the Notice informed Johnson that all business activity for the Café was "immediately suspended" pursuant to Saginaw's Code of Ordinances § 110.06(F). *Id.* at PageID.813. Section 110.06(F) states that "[w]here the City Manager or their designee shall determine that in the interest of the public health, morals, safety, or welfare an immediate suspension is necessary, they shall order the same." Saginaw, Mich., Code of Ordinances § 110.06(F) (2018). The Notice gave the following reasons for the suspension:

(1) Serious and violent criminal activity generated by the operation of this establishment;

(2) The aforementioned serious and violent criminal activity has resulted in significant injury to persons and damage to property;

(3) The aforementioned serious and violent criminal activity has occurred as recently as Saturday, May 6, 2017;

(4) The aforementioned serious and violent criminal activity constitutes a hazardous condition contrary to the health morals, safety, and welfare of the public;

(5) Failure to maintain adequate security to prevent or discourage unlawful behavior.

ECF No. 43-15 at PageID.813 (emphasis omitted). Consistent with Ordinance § 110.06(F), the

---

[5]  The responding officers reported that the gang member appeared "intoxicated" during the interview. ECF No. 43-12 at PageID.783. When police told the gang member's wife about the story, she claimed that he was "making everything up" and that he "lies like this when he is intoxicated." *Id.*

Notice ordered Johnson to appear for an administrative hearing on Thursday, May 11, 2017 to show cause why her license should not be "suspended for an additional period of time or revoked." *Id.* at PageID.814. The Notice was signed and dated by the City Manager, Defendant Timothy Morales. *Id.*

## C.

The hearing took place, as scheduled, on May 11, 2017. *See* ECF No. 43-10 (hearing transcript). Johnson appeared on behalf of herself. *Id.* at PageID.746. The City was represented by counsel. *Id.* at PageID.747. The hearing was presided over by the City's Human Resources Director, Defendant Dennis Jordan. *Id.* at PageID.745.

The hearing lasted a little over two hours and was attended by multiple members of the community—many of whom voiced their support for Johnson and the Café. Most of the substantive testimony, however, came from Chief Ruth, who testified on behalf of the City. Chief Ruth offered testimony on three significant points not discussed in Section I.A., *supra*.

First, Chief Ruth testified that a flyer for Pruitt's birthday party had circulated on social media for some time before the party. *Id.* at PageID.765. The flyer advertised a "cash bar" and entrance fees ranging from $20 to $40. *See* ECF No. 43-8 (flyer). Johnson denied having ever seen the flyer or approving of its contents. ECF No. 43-10 at PageID.754. She stated during her deposition that the suspension hearing was the first time she had ever seen the flyer. ECF No. 43-4 at PageID.705.

Second, Chief Ruth testified that one of the security guards at the Café was seen discharging his firearm into the air during the commotion. ECF No. 43-10 at PageID.764. The firearm in question was described as an AK-47 rifle. *Id.* During her deposition, Johnson testified that "some guys at the front of the [Café]" told her that Blackmon discharged his firearm into the

air "in hopes that the other guys would go away." ECF No. 43-4 at PageID.701. Blackmon vigorously denies discharging his weapon during the shooting. ECF No. 43-9 at PageID.737.

Third, Chief Ruth testified that the 2016 fraternity party at the Café had caused more than just damage to furniture. As Chief Ruth recalled, the party was shut down because a fight between partygoers had escalated into a shootout in the street. ECF No. 43-10 at PageID.763. In response, he and other officials from the City met with Johnson shortly after the party. *Id.* Johnson allegedly "agreed to not have any more events of that nature that could bring in gang members." *Id.* She also apparently agreed "not [] to have any after hours operations whatsoever at her establishment." *Id.* To Chief Ruth, Pruitt's party indicated that Johnson had reneged on her promise. *Id.*

Johnson, on the other hand, acknowledges that she met with city officials but denies ever making such promises. *Id.* She also denies that the fraternity party ended in a shooting. ECF No. 54-1 at PageID.1370 (Johnson's declaration). At the hearing—and at her deposition—Johnson characterized the meeting as a discussion surrounding the noise of the fraternity party and the risk that such events might disrupt neighbors.[6] *Id.* at PageID.767; ECF No. 43-4 at PageID.706.

The hearing also included the testimony of Violet McGarry. McGarry claimed to have seen the shooting outside Pruitt's party from her third-floor apartment on Washington Avenue, allegedly located "right next to" the Café. ECF No. 431-10 at PageID.759–60. She testified that around 1:00 A.M., she and her husband watched as cars went "up and down Washington [Avenue]" and "double park[ed]" in the street. *Id.* She described the occupants of the cars as "thugs" and claimed that they had been attracted to the area by Pruitt's flyer. *Id.* McGarry recounted seeing a man "run across the street" just before the shooting started. *Id.* She testified,

> [W]e saw this one guy come across. There were five or six kind of large gentlemen

---

[6] Specifically, Johnson claims that Chief Ruth showed her a picture of two college-aged women in an alley near the Café and said, "We can't have this." ECF No. 43-10 at PageID.767. Chief Ruth testified that he had no recollection of showing Johnson any such picture. *Id.*

on the other side of the street on the sidewalk. Then this guy comes from - - really from the sidewalk on our side of the street, runs across the road. He did not walk, he ran. And he went up to these six people . . . [a]nd he said something to those six guys. Then he ran towards the Temple Theater and right after that the shooting started. Right after that.

ECF No. 43-10 at PageID.760. McGarry further claimed to have it on "good authority" that the shooting occurred because "Peezy"—the Detroit rapper scheduled to perform at the party—had done something to offend a local gang. *Id.*

On July 14, 2017—more than two months after the hearing—Defendant Jordan issued his written opinion sustaining the suspension of Johnson's business license. *See* ECF No. 43-16. After recounting the evidence presented at the hearing, Jordan concluded, "Had [Pruitt's party] not taken place, there would not have been the gathering of those individuals that ultimately fired 60 rounds of ammunition at and around [the Café]." *Id.* at PageID.828. Jordan further stated that "there was no testimony or evidence provided [at the hearing] that would reverse the decision by the City Manager to suspend the operating license for [the Café]." *Id.*

**D.**

On July 25, 2017, Johnson brought this action pursuant to 42 U.S.C. § 1983 against the City of Saginaw, City Manager Timothy Morales, and Hearing Officer Dennis Jordan. ECF No. 1. The Complaint alleged three counts for the violation of Johnson's right to procedural due process. *Id.* The First Amended Complaint, filed August 23, 2017, added an additional procedural due process count. ECF No. 5. On September 21, 2017, Defendants moved to dismiss the First Amended Complaint for failure to state a claim. ECF No. 11. Shortly thereafter, Johnson moved for leave to file a second amended complaint that would add five new counts, including claims for "selective enforcement," "unlawful burden shifting," and substantive due process. *See* ECF Nos. 15, 15-1. On December 20, 2017, Defendants' Motion to Dismiss was granted and Johnson's

Motion for Leave to File a Second Amended Complaint was denied. ECF No. 20. Johnson immediately filed her Notice of Appeal. ECF No. 22.

On January 7, 2020, the United States Court of Appeals for the Sixth Circuit issued an opinion affirming in part and reversing in part this Court's order dismissing the case.[7] *Johnson v. Morales*, 946 F.3d 911, 916 (6th Cir. 2020). The Sixth Circuit held that Johnson's proposed amended complaint plausibly alleged the violation of her rights to procedural due process, substantive due process, and equal protection. *Id.* at 934–35. On remand, Johnson filed her Second Amended Complaint pursuant to the joint stipulation of the parties. ECF Nos. 28, 29.

The Second Amended Complaint alleges five counts: two for procedural due process, one count alleging no pre-deprivation hearing (Count I) and the other alleging an unlawful allocation of the burden of proof (Counts II); one for substantive due process (Count III); and two for equal protection, one alleging selective enforcement against African American women (Count IV) and the other alleging a "class-of-one" claim (Count V). ECF No. 29 at PageID.463–73. Discovery initially closed in October 2020, but the parties stipulated to an order extending discovery to December 18, 2020 and consolidating this case with *RJS Promotions, LLC v. Timothy Morales, et al.*, No. 20-12763 (E.D. Mich.), which Johnson's counsel had filed shortly before the close of discovery. ECF No. 38.

Defendants moved for summary judgment on January 20, 2020. ECF No. 43. Johnson moved for partial Summary judgment the next day, seeking judgment on all issues except remedies. ECF No. 45. Timely response and reply briefs have been filed. ECF Nos. 49, 52, 53, 54.

---

[7] The Sixth Circuit's opinion is docketed as ECF No. 24.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. "[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## III.

Johnson alleges five claims for relief. The merits of each are considered below. Liability for any constitutional violation is discussed separately in Section IV., *infra*.

## A.

There are two procedural due process claims at issue. Count I alleges that Defendants wrongfully deprived Johnson of a pre-deprivation hearing. ECF No. 29 at PageID.463–64. Count II alleges that Defendants wrongfully shifted the burden to Johnson at the post-suspension hearing by requiring her to show cause why the suspension should not be extended. *Id.* at PageID.465–66.

"The Fourteenth Amendment prohibits states from depriving individuals of life, liberty, or property without due process of law." *Johnson*, 946 F.3d at 921. "Johnson's interest in her business

license is enough to invoke due process protection." *Id.* (citing *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)). "It is the general rule that due process 'requires some kind of a hearing *before* the State deprives a person of liberty or property.'" *Id.* (quoting *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 486 (6th Cir. 2014)) (emphasis original). Nonetheless, "[t]he failure to provide a hearing prior to a license or permit revocation does not per se violate due process." *Id.* (quoting *United Pet Supply*, 768 F.3d at 486). "Thus, the balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), determines whether the government must provide some type of hearing before suspending a business license." *Id.* at 922.

Under *Mathews*, courts must balance three factors to decide whether a pre-deprivation hearing is necessary:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. The Sixth Circuit considered the *Mathews* factors at the pleading stage and found that Johnson should have been afforded a pre-deprivation hearing. *See Johnson*, 946 F.3d at 925.

Regarding private interest, the Sixth Circuit found that "an individual may have a significant interest in maintaining a license" and in avoiding the "depriv[ation] . . . [of] her livelihood." *Id.* at 922. The Sixth Circuit also distinguished *Gilbert v. Homar*, 520 U.S. 924 (1997), where "the [Supreme] Court held that a state university did not violate a tenured police officer's due process rights when it suspended him without a pre-suspension hearing after he was charged with drug-related offenses." *Johnson*, 946 F.3d at 922. The court found that Johnson's situation was more severe than the plaintiff in *Gilbert* because (1) Johnson lacked fringe benefits that could

form a "financial safety net," (2) the *Gilbert* plaintiff had resumed working one month after his suspension and received backpay, and (3) the *Gilbert* plaintiff had been suspended, rather than terminated, and thus lost "relatively insubstantial" income. *Id.* at 922–23.

With respect to risk of error, the Sixth Circuit found that Johnson's suspension likely turned on a "wide amount of information" and that "issues of witness credibility and veracity" were likely "critical in the decision to suspend her license." *Id.* at 924. The court also noted the lack of any apparent "reasonable grounds" to suspend the license comparable to the criminal charges in *Gilbert*. *Id.* at 924. The court acknowledged, however, that it "[could not] know whether the government ensured that there were reasonable grounds to suspend Johnson license without affording her a pre-suspension hearing" because the case was still in the pleading stage. *Id.* at 925.

On the issue of governmental interest, the Sixth Circuit identified no substantial burden that a pre-deprivation hearing would have incurred. Specifically, the court noted a mere three-day difference between when the suspension was issued and when the hearing was conducted, as well as the lack of any indication that a pre-deprivation hearing would have "create[d] an undue financial burden on the government." *Id.* at 923.

Since the Sixth Circuit considered the *Mathews* factors, various evidence has been introduced that alters the analysis. Specifically, there is now evidence that Johnson was earning a modest retirement income aside from the Café, that the Café was not a profitable venture, and that Pruitt's party was connected to the shooting. *See* ECF No. 43-4 at PageID.687 (reporting income from pension, social security, and Veterans Affairs); ECF No. 52-15 at PageID.1344 (Rehmann accounting report). While this newfound evidence results in a closer balance of the interests, the *Mathews* factors still reflect that Johnson should have been afforded a pre-deprivation hearing.

First, it is uncontested that Johnson's license was necessary to sustain the Café and that

Johnson had invested significant time and money into the continued operation of the Café. For example, in addition to purchasing and renovating the building where the Café was located—and investing over $100,000 to do so—Johnson attended culinary school. ECF No. 43-4 at PageID.687–89. Thus, while Johnson's retirement income weighs against her private interest—as does the evidence that the Café was unprofitable— Johnson's interest in the Café, cannot be termed "insubstantial." *Cf. Gilbert*, 520 U.S. at 932 (finding temporary deprivation of income "relatively insubstantial" where employee received prompt post-suspension hearing and kept fringe benefits).

Second, factual questions revealed during discovery reinforce the Sixth Circuit's opinion that the risk of an erroneous deprivation was impermissibly high. For instance, Defendant Morales testified during his deposition that before he issued the suspension notice, Chief Ruth informed him of Pruitt's flyer advertising a "cash bar." ECF No. 43-14 at PageID. 801–03. Chief Ruth also told him that Blackmon had discharged his weapon. *Id.* at PageID.797–98. As discussed in Section I.B., *supra*, Johnson denies having anything to do with the flyer, and Blackmon claims to have never discharged his weapon. While Chief Ruth's statements were not groundless, they involved more than "routine, standard, and unbiased" information, suggesting that a pre-deprivation hearing should have been afforded. *Cf. Mathews*, 424 U.S. at 344 (finding that "the potential value of an evidentiary hearing" was less where the decision to discontinue disability benefits turned on "routine, standard, and unbiased medical reports").

Third, Defendants have yet to offer a meaningful explanation as to why a pre-deprivation hearing would have been unduly burdensome. They argue that a pre-deprivation hearing would not have allowed enough time to complete the criminal investigation, ECF No. 43 at PageID.631, but there is no indication that the criminal investigation was completed when Chief Ruth testified at the hearing just days after the shooting. It is difficult to imagine, then, what administrative or

financial burden the City avoided by scheduling the hearing only a few days after the suspension.

Accordingly, given Johnson's substantial personal investment, the risk of erroneous deprivation, and the lack of any apparent administrative or financial burden, Johnson should have been afforded a pre-deprivation hearing.

The next issue is whether, as Defendants argue, the shooting required "quick action" and thus rendered ordinary pre-deprivation process impracticable. ECF No. 43 at PageID.625. Under Sixth Circuit precedent, "the failure to provide a pre-deprivation hearing does not violate due process in situations where a government official reasonably believed that immediate action was necessary to eliminate an emergency situation and the government provided adequate post-deprivation process." *United Pet Supply*, 768 F.3d at 486 (citing *Harris v. City of Akron*, 20 F.3d 1396, 1403–05 (6th Cir.1994)).

In *Harris*, city officials were informed that a local two-story building was "dangerously close to falling onto [the street] and a neighboring occupied home." *Id.* at 1398. City officials inspected the building later the same day and "determined that an emergency demolition was necessary." *Id.* The building was demolished that afternoon. *Id.* The building owner alleged that his Fourteenth Amendment right to due process was violated given the lack of a pre-deprivation hearing. The district court granted summary judgment for defendants, and the Sixth Circuit affirmed, explaining, "If an emergency existed, the only available course of action for removing the threat to public health and safety was to carry out the demolition forthwith." *Id.* at 1404.

*Harris* is readily distinguishable from this case given the lack of an obvious same-day emergency. Defendant Morales was not confronted with the prospect of a dilapidated building falling into the street, nor did he act as if such a calamity was imminent. He waited until Monday, May 8, 2017 to issue the suspension. ECF No. 43-15. Additionally, there is no evidence that

Johnson had scheduled another event like Pruitt's party or any other event threatening public safety.

Importantly, though, the *Harris* court also held that the official determination as to whether an emergency exists under local ordinance is beyond the scope of a procedural due process challenge:

> Code § 190.705 leaves the determination of whether an emergency existed on July 17 completely within the judgment of the superintendent of building inspection. Harris has not attacked the constitutionality of code § 190.705 for lack of standards or otherwise . . . With the authority of the decision makers unchallenged, the question of whether an emergency actually existed constituted nothing more than a question of whether they made the right decision. By attempting to show only that the defendants made the wrong decision, Harris in no sense attacked the constitutionality of the process by which that decision was reached.

*Harris*, 20 F.3d at 1404 (internal citations omitted). In other words, "where the emergency procedure itself is not challenged on a constitutional basis, the question whether or not the official made the correct decision in invoking that procedure is not of constitutional significance." *Catanzaro v. Weiden*, 188 F.3d 56, 62–63 (2d Cir. 1999) (discussing *Harris*, *supra*); *see also Kircher v. City of Ypsilanti*, No. 05-73425, 2008 WL 2026143, *7 (E.D. Mich. May 9, 2008) (holding that "whether [city official] was correct in his determination [to board up rental property [was] not constitutionally relevant").

Like the plaintiff in *Harris*, Johnson does not appear to challenge Defendant Morales' emergency authority under Ordinance § 110.06(F) but only the correctness of his determination that, as a matter of fact, an emergency existed.[8] Nonetheless, this case is distinguishable from *Harris* because Defendants did not "provide an adequate postdeprivation procedure." *Harris*, 20

---

[8] While the subsequent history of *Harris* is not dispositive here, it bears noting that the decision has been criticized for showing "unnecessary" deference to public officials. *See, e.g.*, *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 418 n.4 (3d Cir. 2008). Furthermore, the Sixth Circuit has since recognized an exception where the official determination was "pretextual." *See DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 614 (6th Cir. 2015).

F.3d at 1404.

As stated previously, Count II alleges that Defendants improperly shifted the burden to Johnson during the post-deprivation hearing by requiring her to show cause why the suspension should not be extended. ECF No. 29 at PageID. PageID.465–66. The Sixth Circuit has already decided that, as a matter of law, the lack of a pre-deprivation hearing combined with post-deprivation burden-shifting is inconsistent with due process:

> Johnson plausibly alleges that by depriving her of a pre-deprivation hearing and requiring her to bear the burden of proving that her business was not a threat to the public health, morals, safety, or welfare, the ordinance created a situation where Johnson's vested property interest in her business license could be revoked without any proof, but reinstated only if Johnson proved that her business was not a danger to the health, morals, safety, or welfare, of the city; and that such a system unfairly jeopardized Johnson's property interest in her means of livelihood, an interest that this court and the Supreme Court have recognized as one of the most significant that an individual can possess. Given the nature of the right involved, a post-deprivation hearing in which the suspension is presumed to be warranted and Johnson bore the burden to prove the opposite fails to provide the meaningful procedure mandated by due process.[9]

*Johnson*, 946 F.3d at 937 (internal citations and quotation marks omitted). Accordingly, the burden-shifting at Johnson's post-deprivation hearing renders *Harris* inapplicable.

Defendants' principal argument regarding burden-shifting is to deny that the burden in this case was actually shifted. *See* ECF No. 43 at PageID.632–33. Defendants rely on a highly formalistic interpretation of Ordinance § 110.06(F) whereby even though "the City's obligation is not stated [in Ordinance § 110.06(F)], if the ordinance had placed no burden on the City to present evidence, [then] the licensee would have nothing to rebut or defend." ECF No. 43 at PageID.633. In other words, the fact that Johnson presented a "defense" at her hearing proves that the City had

---

[9] The Sixth Circuit's analysis seems to support a construction of Counts I and II as complimentary due process theories rather than as independent causes of action. Indeed, the Sixth Circuit's approval of the burden-shifting claim is at least partly premised on the "depriv[ation]" of a pre-suspension hearing. *See Johnson*, 946 F.3d at 937.

some initial "burden."

Defendants' argument appears to be an equivocation. The only "burden" that Ordinance §

110.06(F) allocates to the City is the discretion to issue an immediate suspension.[10]  While the City

may introduce evidence—and did so in this case—it is not required to do so. Johnson, by contrast,

had the burden of showing why her license should not be suspended. The default position, then,

was that the City's immediate suspension would remain final. *See* ECF No. 43-15 at PageID.814

("Failure to appear at the hearing may further result in the continued suspension [of the license].")

(emphasis omitted). Defendant Jordan proved as much when he concluded in his opinion, "[T]here

was no testimony or evidence provided that would *reverse* the decision by the City Manager . . .

Therefore, the notice of suspension . . . is sustained." ECF No. 43-16 at PageID.828 (emphasis

added). Under the circumstances, such burden-shifting "fails to provide the meaningful procedure

mandated by due process." *Johnson*, 946 F.3d at 937.

Based on the foregoing, Johnson has established constitutional violations resulting from

the lack of a pre-deprivation hearing (Count I) and the burden-shifting at her post-deprivation

hearing (Count II). Whether Defendants can be held liable for these violations is discussed in

Section IV., *infra*.

**B.**

Johnson states one claim for the violation of substantive due process (Count III). She argues

that that the suspension of her business license on the basis of the criminal actions of third parties

is "arbitrary and capricious" and "extremely irrational[]." ECF No. 29 at PageID.467.

Substantive due process is "[t]he doctrine that governmental deprivations of life, liberty or

---

[10]  It is irrelevant that the City's discretion is nominally limited by the City Manager's "determination" that a suspension is "necessary." Saginaw, Mich., Code of Ordinances § 110.06(F) (2018). Such limitation has no bearing on the burdens at the post-deprivation hearing.

property are subject to limitations regardless of the adequacy of the procedures employed." *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir.1992)). "One aspect of substantive due process is the right to be free of 'arbitrary and capricious' action by government actors." *Id.* "To prevail on her proposed substantive-due-process claim, Johnson must show 'that there is no rational basis' for the City's decision to suspend her business license." *Johnson*, 946 F.3d at 937.

When the Sixth Circuit previously considered this case, it held that Johnson plausibly alleged the violation of substantive due process. *Id.* at 939. As the court explained, "Suspending Johnson's business license because of unlawful acts of unaffiliated persons of which she had no prior notice qualifies as extremely irrational." *Id.* at 938. The court found that "suspending Johnson's license is rational only if Johnson and her business somehow caused or contributed to the violence." *Id.*

As illustrated by Section I.A., *supra*, discovery has left many questions unanswered, including whether shots were fired inside the Café, whether Blackmon discharged his firearm, and—most importantly—who the shooters were. Perhaps the shooters were—as Violet McGarry testified—revenge-seeking "thugs" looking to harm a Detroit rapper. Perhaps Chief Ruth is right, and the shooters were rival gang members.

While these questions remain significant to the City and its residents, they do not preclude summary judgment against Johnson's substantive due process claim. Even when viewing the record in the light most favorable to Johnson, no reasonable factfinder could deny that "Johnson and her business [] caused or contributed to the violence." *Johnson*, 946 F.3d at 938. But for Johnson's decision to rent the Café to Pruitt, and thereby allow hundreds of partygoers to gather for an afterhours function, the shooting would not have occurred. Indeed, the Café was the only

business open in the area when the shooting started, ECF No. 43-14 at PageID.798–99, and the only testimony regarding the identity of the shooters suggests that they were on Washington Avenue because of Pruitt's party,[11] *see* ECF No. 43-10 at PageID.760 (Violet McGarry's testimony); ECF No. 43-13 at PageID.793 (Chief Ruth's testimony).

Johnson's suggestion that the shooting was "random" appears, at best, to be inaccurate. *See* ECF No. 45 at PageID.948. Johnson required Pruitt to obtain at least ten security guards for the event. ECF No. 43-4 at PageID.696. She saw Blackmon patrolling the party with a firearm slung around his neck. *Id.* at PageID.701. She knew that a prior party had damaged the Café.[12] *Id.* at PageID.698. She also knew that Pruitt had procured a Detroit rapper who, according to Blackmon, was notorious for "bring[ing] out a certain kind of crowd." ECF No. 43-9 at PageID.741. Blackmon testified that when he learned who the musical headliner after arriving at the Café, he thought to himself, "Ah, I shouldn't have even came." *Id.*

Johnson argues that she has no duty to protect patrons from the criminal actions of third parties. *See* ECF No. 45 at PageID.949. She is largely correct, particularly with respect to Michigan common law. *See MacDonald v. PKT, Inc.*, 628 N.W.2d 33, 39 (Mich. 2001) ("[A]s a matter of law, fulfilling the duty to respond requires only that a merchant make reasonable efforts to contact the police."); *Mouzon v. Achievable Visions*, 864 N.W.2d 606, 609 (Mich. Ct. App. 2014) (holding that dance club did not breach the duty to reasonably expedite involvement of police because police were already on scene). Regardless, Johnson cites no authority indicating that the police power of a municipality is limited by the common law duties of proprietors. Furthermore, this Court lacks

---

[11] Johnson objects to the consideration of Chief Ruth's testimony insofar as it is premised on the police interview with the self-proclaimed "Latin King," which she claims is inadmissible hearsay. *See* ECF No. 49 at PageID.114. Johnson's objection is noted but need not be decided because even without Chief Ruth's gang testimony, the record conclusively shows that the Café caused or contributed to the shooting.
[12] Viewing the record in the light most favorable to Johnson, this Court assumes that the 2016 fraternity party did not end in a shooting, as Chief Ruth testified.

jurisdiction to decide whether the City's decision was wise or whether reasonable alternatives existed. The question here is simply whether the City had a rational basis for suspending Johnson's license. *Johnson*, 946 F.3d at 937. The record establishes that it did.

Accordingly, Defendants' Motion for Summary Judgment will be granted with respect to Johnson's substantive due process claim. Johnson's Motion for Partial Summary Judgment will be denied with respect to the same.

## C.

Johnson also argues that Defendants violated her rights under the Equal Protection Clause. The Second Amended Complaint states two separate equal protection claims.

## 1.

Count V alleges that Defendants intentionally treated Johnson differently than all similarly-situated persons—what is commonly called a "class-of-one" theory. ECF No. 29 at PageID.471–73. To prevail, Johnson must prove "that [1] she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Johnson*, 946 F.3d at 939 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). "The first element requires that the plaintiff and the others who were treated differently were 'similarly situated in all relevant respects.'" *Id.* (quoting *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 865 (6th Cir. 2012)). Johnson may prove the lack of a rational basis "in one of two ways: either by negativ[ing] every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)).

The Sixth Circuit held that Johnson plausibly alleged a class-of-one theory based on the disparate treatment of the Café compared to other Saginaw businesses. *Id.* at 940. The court

considered the example of Dom's Food Market, a convenience store less than a mile from the Café. In September 2017, a man was shot and killed outside Dom's, but the City did not suspend Dom's business license. *Id.* The Sixth Circuit found that the Café and Dom's were "similarly situated" given that "[b]oth establishments sell food to the public" and both establishments suffered "a random shooting with unknown shooters." *Johnson*, 946 F.3d at 939. The court also rejected Defendants attempt to distinguish the Café shooting as "gang-related." As an initial matter, the court found no indication that the Dom's shooting was unrelated to gang activity. *Id.* at 940. Additionally, the court noted that the "circumstances and manner of the shooting at Dom's and the shooting at [the Café] appear[ed] very similar: unknown individuals arriving and shooting at a business." *Id.*

On remand, Defendants justify the disparate treatment by claiming that the shooting at Dom's was "truly random." ECF No. 43 at PageID.637. The police report indicates that the victim was shot several times as he was exiting Dom's. *See* ECF No. 43-19 at PageID.862 (Dom's shooting police report). There is no indication that the shooting was gang related or that the operation of Dom's somehow caused the shooting. In contrast, the record conclusively demonstrates that the Café caused or contributed to gunfire on the morning of May 6, 2017. *See* Section III.B., *supra*. Consequently, even assuming that Dom's and the Café are similarly situated in all relevant aspects, no reasonable factfinder could deny that the City had a rational basis for the disparate treatment.

Johnson also identifies two other shootings that did not result in license suspensions: one at Neutral Zone Sports Bar and one at Covenant HealthCare Hospital. *See* ECF No. 49 at PageID.1116. Johnson contends that these businesses are "similarly situated" with the Café because they all suffered "random, unauthorized shooting by individual(s) who were not agents or

employees of the business." *Id.* at PageID.1117. She argues that this disparate treatment lacks a rational basis *Id.* at PageID.1117–18.

At his deposition, Defendant Morales testified that he did not suspend the licenses of Neutral Zone and Covenant because they cooperated with the City to "improve [their] safety and security." ECF No. 43-14 at PageID.807. Johnson calls this explanation "ludicrous" because the City has no formal policy or ordinance requiring business owners to contact the City about improving security after a shooting. ECF No. 49 at PageID.1117–18. She does not deny that Neutral Zone or Covenant reached out to the City, nor explain why the City would need a written policy to justify disparate treatment that was otherwise rational. Additionally, as with the shooting at Dom's, there is no reason to believe that the shootings at Neutral Zone and Covenant were caused by the operation of those businesses.

Johnson also has not introduced any evidence of animus or ill-will. While the Second Amended Complaint claims that the suspension was "specifically designed to destroy [the Café's] commercial interests, ECF No. 29 at PageID.458, Johnson testified during her deposition that this allegation was premised on her "personal belief," ECF No. 43-4 at PageID.709. Such beliefs or intuitions do not create a genuine issue of fact regarding discriminatory purpose. *See Bowman v. City of Olmsted Falls*, 756 F. App'x 526, 530 (6th Cir. 2018) (granting summary judgment for defendants where plaintiff's proof of discriminatory purpose was his own "speculation and intuition").

To survive summary judgment, Johnson needed to negate "every conceivable basis" for the disparate treatment or provide some evidence of ill-will on behalf of the City. *Johnson*, 946 F.3d at 939. Simply pointing to other businesses that suffered shootings and retained their licenses is not enough. Accordingly, Defendants' Motion for Summary Judgment will be granted as to

Count V. Johnson's Motion for Partial Summary Judgment will be denied as to the same.

## 2.

Count IV alleges that the suspension of Johnson's business license constituted selective enforcement against Johnson as an African American woman. ECF No. 29 at PageID.469–71; ECF No. 45 at PageID.951.

A selective enforcement claim has three elements:

First, [the state actor] must single out a person belonging to an identifiable group, such as . . . a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, he must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Libertarian Party of Ohio v. Husted*, 831 F.3d 382, 394–95 (6th Cir. 2016). As an initial matter, Defendants argue that the selective enforcement claim should not be considered because the Sixth Circuit rejected it as futile. ECF No. 52 at PageID.1166. Johnson, on the other hand, contends that "[t]he Sixth Circuit majority treated the original equal protection claim as a class of one claim" and therefore "never precluded the traditional selective enforcement claim." ECF No. 54 at PageID.1367. Neither side provides the whole picture.

In October 2017, shortly after Defendants' Motion to Dismiss was filed, ECF No. 13, Johnson moved for leave to file a second amended complaint, ECF No. 15. Among the new claims Johnson proposed was a count for "selective enforcement." ECF No. 15-1 at PageID.256–57. The proposed count alleged that Johnson's business license was suspended "due to an unjustifiable standard premised on an arbitrary classification." *Id.* at PageID.257. In granting Defendants' Motion to Dismiss, this Court also denied Johnson leave to add the proposed "selective enforcement" count because "Johnson ha[d] not alleged that she [was] a member of an identifiable and protected group." ECF No. 20 at PageID.393. This Court noted that the claim might "at best"

be construed under a class-of-one theory but that such a claim would be futile given that Johnson failed to overcome the rational basis standard.[13] *Id.* at PageID.394.

On appeal, Johnson argued that this Court erred in denying her leave to file a second amended complaint. Judge Nalbandian delivered the opinion of the court except as to the burden-shifting, substantive due process, and equal protection claims. On those issues, Judge White wrote the separate opinion of the majority.

In his dissent, Judge Nalbandian construed the equal protection claim as alleging selective enforcement and stated that he would have affirmed this Court's denial of leave to amend. *See Johnson*, 930 F.3d at 930–31 (Nalbandian, J., dissenting). The majority, however, held that the claim alleged a plausible "equal-protection violation based on a 'class of one' theory." *Id.* at 939. The majority did not address Judge Nalbandian's selective enforcement analysis. The opinion of the court provides,

> For these reasons, and the reasons expressed in the separate majority opinion, we AFFIRM the judgment of the district court *except* on Johnson's claims that Defendants violated her: (1) rights to procedural due process by denying her a pre-suspension hearing; (2) rights to procedural due process by shifting to her the burden of showing cause; (3) rights to equal protection *based on her class-of-one theory*; and (4) rights to substantive due process.

*Id.* at 934 (emphasis added). Accordingly, the Sixth Circuit reversed this Court's judgment on the proposed equal protection claim only insofar as Johnson alleged a class-of-one theory.[14] Once the case returned on remand, however, the parties filed a joint stipulation seeking to add *two* equal

---

[13] This Court also relied on *Enquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008), where the Supreme Court signaled its disapproval of class-of-one claims based on state actions "which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* at 603. On appeal, the Sixth Circuit seemed to hold that *Enquist* should be limited to the public employment context. *See Johnson*, 946 F.3d at 939 n.5.

[14] This conclusion is buttressed by the Sixth Circuit's use of the singular demonstrative pronoun. *See Johnson*, 946 F.3d at 940 ("Because Johnson's proposed second amended complaint plausibly alleges a 'class of one' selective-enforcement claim and her claim was therefore not futile, we reverse the district court's denial of leave to amend her complaint to assert *that* claim.") (emphasis added).

protection clams: one for selective enforcement, and the other premised on a class-of-one theory. ECF No. 28. The stipulation was granted, and Johnson's Second Amended Complaint was filed, containing both a selective enforcement claim (Count IV) and a class-of-one claim (Count V). ECF No. 29.

The parties thus find themselves in something of a procedural quagmire. Accordingly, this Court will assume, without deciding, that the selective enforcement claim was properly pled because the claim nevertheless fails as a matter of law.

As stated above, Johnson must prove (1) membership in an identifiable group, (2) discriminatory purpose, and (3) discriminatory effect. *Libertarian Party of Ohio*, 831 F.3d at 394–95. Because Johnson's putative identifiable group is "African American women," ECF 45 at PageID.951, she must introduce some evidence that Defendants suspended her license because she is an African American woman in order to survive summary judgment. More specifically, she must introduce "clear evidence" given the "strong presumption" that Defendants "properly discharged their official duties." *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000).

Johnson has not carried her burden here. Rather than offer direct evidence of racial animus, she relies on the alleged disparate treatment itself, arguing that the "only obvious difference" between her and other business owners is that she is an African American woman. ECF No. 45 at PageID.951–52. Even if the owners of Dom's, Neutral Zone, and Covenant are not African American women, there is no question that Defendants had a rational basis for the disparate treatment, as discussed in Section III.C.1., *supra*. Furthermore, it is a "fundamental principle that official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Hernandez v. New York*, 500 U.S. 352, 359–60 (1991) (internal quotation marks omitted); *see also Ryan v. City of Detroit*, 174 F. Supp. 3d 964, 973 (E.D. Mich.

2016) ("Even if the Court were to assume that Katie was treated differently than other victims of domestic violence, such disparity without evidence of discriminatory intent is, as a general matter, constitutionally insufficient.") (collecting cases), *aff'd sub nom. Ryan v. City of Detroit, MI*, 698 F. App'x 272 (6th Cir. 2017).

Accordingly, Defendant's Motion for Summary Judgment will be granted with respect to Count IV. Johnson's Motion for Partial Summary Judgment will be denied with respect to the same.

## IV.

The next issue is which Defendants can be held liable for the due process violations discussed in Section III.A., *supra*. For reasons explained below, Defendant City of Saginaw is liable by virtue of its final policymaker, Defendant Morales. Defendants Morales and Jordan, however, are entitled to qualified immunity.

## A.

"[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978)) (emphasis original). "A municipality can be liable under 42 U.S.C. § 1983 only if the plaintiff can demonstrate that his civil rights have been violated as a direct result of that municipality's policy or custom." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 900 (6th Cir. 2004). A policy or custom for *Monell* purposes may be demonstrated by proving one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the

existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

"A single decision can constitute a policy, if that decision is made by an official who 'possesses final authority to establish municipal policy with respect to the action ordered.'" *Flagg v. City of Detroit*, 715 F.3d 165, 174–75 (6th Cir. 2013) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)). An official only possesses such "final authority if "his decisions are 'final and unreviewable and are not constrained by the official policies of superior officials.'" *Id.* (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir.2005)). Whether an official is the final policymaker for a local government is a question of state law that must be decided by reference to "statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993).

Here, Johnson correctly argues that Morales, as City Manager, was the final decisionmaker for the City with respect to the process she was afforded. *See* ECF No. 45 at PageID.955. Ordinance § 110.06(A) provides, "The City Manager or their designee may suspend, revoke, or deny renewal of a license for cause of any license or permit issued by the City in the manner herein provided." Ordinance § 110.06(F) similarly states, "Where the City Manager or their designee shall determine that in the interest of the public health, morals, safety, or welfare an immediate suspension is necessary, they shall order the same."

The matter is not without complexity, though. Ordinance § 110.06(F) is also replete with mandatory phrasing, such as the language stating that the City Manager "shall order" an immediate suspension. Such language might suggest that the City Manager is not a policymaker but simply an official with the "[m]ere authority to exercise discretion while performing particular functions." *See Feliciano*, 988 F.2d at 655 (holding that police chief was not final policymaker where he was

-27-

subordinate to public safety director who could review chief's policy statements). Moreover, Ordinance § 110.06(D) requires the City Manager to appoint a hearing officer who, after conducting a public hearing, determines whether the license "should be suspended, revoked, or denied renewal." Accordingly, the City Manager's suspension of a business license is not unreviewable.

Regardless, these limitations are ultimately immaterial because the "policy" at issue for purposes of Counts I and II is Morales' decision to immediately suspend Johnson's license, not the final decision to uphold the suspension. While Ordinance § 110.06 regulates the manner with which the suspension hearing is conducted and how the final decision is reached, only the City Manager decides whether a licensee receives pre-deprivation process, and his "determination" is only nominally guided by the "public health, morals, safety, [and] welfare" of the City. Therefore, Morales was the final policymaker with respect to the kind of process that Johnson was afforded.

Based on the foregoing, the City can be held liable for Morales' decision to immediately suspend Johnson's business license and subject her to post-deprivation burden-shifting.[15] As such, Johnson's Motion for Partial Summary Judgment will be granted against Defendant City of Saginaw as to Counts I and II. Defendant City of Saginaw's Motion for Summary Judgment will be denied with respect to the same.

**B.**

Qualified immunity is a judicially crafted doctrine that "shield[s] [public officials] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Public officials thus are eligible for qualified immunity if (1) they did not

---

[15] Accordingly, Johnson's alternative "legislative enactment" theory will not be reached.

violate any constitutional guarantees or (2) the guarantee, even if violated, was not 'clearly established' at the time of the alleged misconduct." *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009)). "Both inquiries are 'objective,' as they turn on what the law is today and whether it was clearly established at the time of the challenged action." *Id.* at 440 (citing *Harlow*, 457 U.S. at 818–19).

Defendants Morales and Jordan are entitled to qualified immunity because Johnson has failed to show that they violated a clearly established right. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

While Defendants Morales and Jordan should have been aware that Johnson had a protectable property interest in her business license, there was no authority clearly establishing the right to a hearing prior to the suspension of a business license, especially when the predicate for suspension was community violence. Similarly, prior to the Sixth Circuit's decision in this case, there was no Sixth Circuit precedent establishing that burden-shifting at a post-deprivation hearing was incompatible with due process. The authority that Johnson cites as clearly establishing her rights merely observes general rules regarding due process and civil litigation. *See, e.g.*, *Zinermon v. Burch*, 494 U.S. 113 (1990) ("Applying [the *Mathews*] test, [the Supreme] Court usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property.") (emphasis original); *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) (discussing burden of proof in federal civil litigation and holding that "default rule" that party

seeking relief bears burden should apply in Individuals with Disabilities Education Act litigation). While there need not have been "a case directly on point, [] existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam).

Furthermore, public officials discharging their duties in reliance on a facially valid ordinance are typically entitled to qualified immunity. *See, e.g.*, *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 441 (6th Cir. 2016) ("[P]ublic officials should generally receive qualified immunity when enforcing properly enacted laws."); *Rodriguez v. City of Cleveland*, 439 F. App'x 433, 448 (6th Cir. 2011) (holding that police officers were entitled to qualified immunity where they "reasonably understood" facially valid ordinance to authorize impounding of vehicles). This rule is particularly relevant for Defendant Jordan who conducted the post-deprivation hearing in the manner required by local ordinance. *See* Saginaw, Mich., Code of Ordinances §§ 110.06(D), (F) (2018).

Based on the foregoing, Defendants Morales and Jordan are entitled to qualified immunity with respect to the procedural due process violations discussed in Section III.A., *supra*.[16] As such, Defendant Morales and Jordan will be granted summary judgment and dismissed from the case.

## V.

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 43, is **GRANTED IN PART** and **DENIED IN PART**.

---

[16] There is nothing inherently inconsistent with granting Defendant Morales qualified immunity while finding the City liable based on his actions. The applicability of *Monell* and qualified immunity turn on distinct issues of fact and law. *See Doe v. Sullivan Cty., Tenn.*, 956 F.2d 545, 554 (6th Cir. 1992) ("[T]he dismissal of a claim against an officer asserting qualified immunity in no way logically entails that the plaintiff suffered no constitutional deprivation, nor, correspondingly, that a municipality (which, of course, is not entitled to qualified immunity) may not be liable for that deprivation."). In this case, Morales, in his policymaking capacity, violated a constitutional right that was not clearly established. As a result, he is entitled to qualified immunity, even though the City can be held liable for his policymaking.

It is further **ORDERED** that Plaintiff's Motion for Partial Summary Judgment, ECF No. 45, is **GRANTED IN PART** and **DENIED IN PART**.

It is further **ORDERED** that summary judgment is **GRANTED** in favor of Plaintiff against Defendant City of Saginaw as to Counts I and II of the Second Amended Complaint, ECF No. 29, except as to the issue of remedies. All remaining counts against Defendant City of Saginaw are **DISMISSED**.

It is further **ORDERED** that summary judgment is **GRANTED** in favor of Defendants Timothy Morales and Dennis Jordan as to all counts. Defendants Morales and Jordan are therefore **DISMISSED**.

Dated: March 12, 2021                                    s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge